OPINION OF THE COURT
Simons, J.
Defendant Eulogio Cruz has been convicted of murder, second degree, committed during the course of a gas station robbery in The Bronx. Defendant Belton Brims has been convicted of two counts of murder, second degree, and other crimes committed during the burglary of a private home in Spring Valley, New York. Both defendants were tried jointly with codefendants and the principal issues submitted in these appeals are whether the courts’ refusal to grant defendants’ motions for severance resulted in trials impermissibly flawed contrary to the rule of Bruton v United States (391 US 123; see also, Roberts v Russell, 392 US 293), and if not whether reversal is nevertheless required because the prosecutions failed to meet minimum standards of fairness (see, People v Payne, 35 NY2d 22; People v La Belle, 18 NY2d 405). In each trial statements of the codefendants and the defendants were received in evidence. The basis for defendants’ claims are their assertions not only that the content of their nontestifying codefendant’s statements did not "interlock” with their own but that even if the statements were substantially the same, defendants were prejudiced because the reliability of the codefendants’ confessions, made in the controlled environment of a police station, to police officers and under circumstances rendering them more credible, was greater than that of defendants’ alleged confessions, made to lay witnesses having motives to falsify. Because of this difference in reliability, defendants contend that the *65 jurors must have used the codefendants’ statements to resolve any doubts about defendants’ guilt, even though they were instructed not to do so. Defendant Brims urges other grounds for reversal but those claims are either unpreserved or harmless (see, People v Crimmins, 36 NY2d 230). Neither defendant challenges the sufficiency of the evidence and, in the absence of legal error, the convictions should be upheld.
There should be an affirmance. The introduction of a codefendant’s testimony may, in some instances, substantially impair the defendant’s right to confrontation or to a fair trial. The confessions of the defendant and codefendant in each of these cases interlocked, however, and even though they differed in length and in the circumstances under which they were made, the codefendant’s statements could properly be received with appropriate limiting instructions, regardless of differences in their comparative reliability (People v McNeil, 24 NY2d 550, cert denied sub nom. Spain v New York, 396 US 937; Parker v Randolph, 442 US 62). Because defendants’ statements not only interlocked with those of their codefendants, but also contained legally corroborated admissions of all the elements of the crime of which they were convicted, defendants were not denied a fair trial and the motions for severance were properly denied.
PEOPLE v CRUZ
Defendant Cruz was indicted with his brother, Benjamin, for the felony murder of a gas station attendant committed November 29,1981. Jerry Cruz, who was not related to defendant, was also a participant in the robbery. Some five months later Jerry Cruz was killed and during the course of the investigation of that homicide, the police interviewed his brother, Norberto. Norberto told the police that defendant and Benjamin came to his apartment the morning after the gas station robbery and that at the time defendant was nervous and wearing a bloodstained bandage around his right forearm. Norberto said that defendant told him that he and Benjamin had gone to a gas station in The Bronx the night before intending to rob it and that during Eulogio’s struggle with the attendant the attendant had bent down behind the counter, procured a gun and shot him in the arm. Defendant said that Benjamin then jumped up and shot the attendant. Norberto said Benjamin told him a similar account of the incident, although he did not explain to Norberto how defendant was injured or that the brothers had gone to the station that night intending to rob it. Norberto said that he had offered to take defendant to *66 the hospital for treatment of his wounds but defendant refused to go because to do so was "very dangerous”. At the trial, Norberto testified that he had been a friend of Eulogio’s for 25 years, since they had grown up together in Puerto Rico. He remembered the date Eulogio and Benjamin came to his apartment because his wife was discharged from the hospital that day. When asked on cross-examination why he had not gone to the police earlier with this information, Norberto said that he could not because his brother Jerry "had the event”.
Shortly after Norberto’s statements to the police, Benjamin Cruz learned that they were looking for him and went to the police station. While he was being questioned about the death of Jerry Cruz, he blurted out that he and defendant had killed the gas station attendant in The Bronx. Subsequently he gave a complete confession to the police which was recorded on videotape. Defendant and his brother were indicted together for felony murder.
Before the trial defendant moved for a severance, but the motion was denied (see, 119 Misc 2d 1080). Both Norberto’s testimony implicating the brothers and the videotape of Benjamin’s confession were received in evidence during the trial with appropriate limiting instructions. The first trial was aborted because of juror misconduct but the confessions were again received at a second trial which resulted in the judgment now before us convicting defendant. In addition, the People presented police testimony, forensic evidence and photographs which established the robbery and the killing, the location of the victim’s body, the injuries to this face and the substantial damage to the office, inferentially establishing defendant’s struggle with the attendant before the murder. Also introduced was medical evidence of the trajectory of the bullets as they entered the victim’s head from above, corroborating the evidence that Benjamin was above the attendant when he shot him. Defendant offered no evidence and both defendants were convicted of felony murder.
BELTON BRIMS
Defendant Belton Brims was convicted of two counts of intentional murder, two counts of felony murder, two counts of robbery, first degree, and two counts of burglary, first degree. The charges arose out of an incident occurring December 28, 1980 when defendant and James Sheffield, with the assistance of Sheryl Sohn and Willie Brims, burglarized Sheryl’s home and killed her parents. On January 1,1981 defendant was arrested in New *67 York on three other felony charges. He was a prime suspect in the Sohn murders at the time but, after he waived extradition, he was returned to New Jersey to answer felony charges against him there. Brims was subsequently convicted in New Jersey of armed robbery and sentenced to a term of imprisonment of 25 years to life. In the meantime, defendant, Sheryl Sohn and James Sheffield were indicted in New York for multiple charges arising out of the Sohn homicides. Defendant was returned to New York and the three defendants were tried together.
None of the defendants testified, but Sheryl Sohn’s confession to the police, in which she told the police that she had helped Brims and Sheffield enter her parents’ home the evening of the crime, was received in evidence against her. She said she had met the two men at a bar and told them she would unlock the door for them; they could await her parents’ return from a party and then, when they returned, rob them. She also agreed that they could have all the valuables they found, except for a diamond ring which her mother would be wearing that she wished for herself. Sheryl said that defendant and others left for the house while she remained at the bar with a friend, but they returned shortly thereafter and told her they were unable to get in. She went home, checked the door again to insure that it was unlocked, and then returned and told defendant and Sheffield. Apparently they were still unable to enter the house and returned to the bar a third time. At that time Sheryl explained the floor plan of the house to the defendants and they left. Her oral statements were later reduced to writing and admitted at the trial. Her statement was redacted to eliminate references to other crimes but the names were left in it.
The People introduced two prior statements by defendant. One was made to his cousin, Willie Brims, who had gone to the Sohn house with defendant and Sheffield but remained in the car while they were inside. Willie Brims was not charged with any crime despite his participation that night. He testified about the several trips from the bar to the house and return while defendant and Sheffield tried to gain entry, about leaving the house after the crime, and about the place where the participants had disposed of various pieces of evidence after the homicides. Willie testified that when defendant returned to the car after leaving the Sohn’s house on the night of the crime, he told him that he had "done some serious business” inside. Defendant explained that statement to him a few days later. He said that when the Sohns had returned to the house that night Sheffield "had beat [Mr. Sohn’s] brains out with the butt of a gun” and that he had "drowned the *68 bitch”. Defendant said he had made Mrs. Sohn drink gin before drowning her and that she had fainted when she saw her husband assaulted. He then dumped her into the bath tub he had filled with water, face down. During this conversation with Willie, defendant showed him a photo of Jackie Shoulders and said she was his girlfriend. Defendant told Willie to "be cool” and in 30 to 90 days they would be paid for the jewelry.
The People introduced another statement of defendant made to John Riegel, a New Jersey prisoner occupying a cell near defendant during his incarceration there in January 1981. Riegel had been a former assistant bank vice-president and private entrepreneur who, after a series of financial setbacks, had turned to crime. Between 1977 and 1981 he had been the subject of several charges involving forgery, issuing bad checks and the use of stolen credit cards.
Riegel testified that, during the nine days they were together in jail, defendant told him that he had planned the Spring Valley robbery with the slain couple’s daughter, that he and his partner had waited in the house until the victims had returned home and that he had drowned the woman. Defendant said he had told his partner to kill the husband by hitting him over the head. Riegel said that defendant claimed he had received about $20,000 to $25,000 in the robbery and that all the daughter wanted for her help was a diamond ring. Defendant also told him that he had given part of the jewelry to a young girl from Virginia (Jackie Shoulders). Defendant was worried because her name was on a slip of paper in his pants pocket and if the police found the slip and located her they would discover that she had received from him a valuable piece of jewelry missing after the robbery.
There was substantial evidence to corroborate these confessions, indeed the evidence of defendant’s guilt was overwhelming. Some of the more significant items included evidence of blood discovered in Willie’s car in places consistent with his testimony about his passengers and where they entered and exited the car after the killings and the ski mask and gun used the evening of the crime, which was found in the place he had described. Forensic evidence was introduced which established that the gun was broken and that the pattern injuries on Mr. Sohn’s skull exactly matched its shape. Forensic evidence also established that blood found on defendant’s sneakers after the crime was the same as a very rare blood type possessed by Mr. Sohn. Defendant attempted to establish an alibi, that he was in New York City acquiring drugs for Sheryl at the time of the killing, but even his witnesses failed to support his alibi.
*69 The Legislature has provided that the prosecution of two or more parties charged with the same offense or offenses may be joined for trial (CPL 200.40). Recognizing that joinder results in prejudice, however, it granted the court the power to order separate trials when the public policy considerations of trial convenience, economy of judicial and prosecutorial resources and speed which underlie the statute are outweighed by unfairness to the accused. An application for severance is addressed to the Trial Judge’s discretion. He must decide whether possible unfairness will result, whether it can be minimized by measures short of separate trials or whether severance is required. Normally, the trial court’s ruling on the motion will not be disturbed but his discretion is not absolute, nor is his determination final, for "[a] retrospective view by an appellate court may reveal injustice or impairment of substantial rights unseen at the beginning” (People v Fisher, 249 NY 419, 427). Accordingly, we may properly review the courts’ severance rulings in these two appeals.
When two defendants are tried together, the extrajudicial statement of one is hearsay as to the other and, if the statement is admissible at all, it may be admitted only when the jury is properly instructed that it may not consider one defendant’s statement as evidence in assessing the guilt of the other. In Bruton the Supreme Court held that because of the substantial risk that a jury, despite such instructions to the contrary, will look to the incriminating extrajudicial statements of a nontestifying codefendant, admitting such a confession violates defendant’s right of confrontation (Bruton v United States, 391 US 123, supra; see also, People v Safian, 46 NY2d 181, 187, cert denied sub nom. Miner v New York, 443 US 912). A recognized exception to the Bruton rule holds that if the statements of the defendant and codefendant are substantially identical, or "interlock”, there is no violation of defendant’s right to confrontation. The rationale is that if the statements interlock, the codefendant’s statement is no more inculpating than is defendant’s statement. It can hardly have the "devastating effect” on defendant’s case referred to in Bruton if defendant similarly has admitted his complicity in the crime (see, People v McNeil, 24 NY2d 550, 553, supra). Key also is recognition that the right to confrontation is not absolute (Dutton v Evans, 400 US 74, 89; People v Sugden, 35 NY2d 453, 460). The confrontation clause is intended to insure fairness and accuracy by giving a defendant an opportunity to challenge evidence against him, particularly a codefendant’s statement, even though the jury may not consider it, because of the natural tendency of a codefendant to shed blame and implicate his accomplice. The danger that the *70 jury will consider unreliable hearsay is minimized, however, when the defendant has confessed. For these reasons, the interlocking confession exception to the Bruton rule was recognized early by this court (People v McNeil, supra; People v Galloway, 24 NY2d 935) and by lower Federal courts (see, e.g., United States ex rel. Catanzaro v Mancusi, 404 F2d 296 [2d Cir], cert denied 397 US 942; Mack v Maggio, 538 F2d 1129 [5th Cir]; United States v Walton, 538 F2d 1348 [8th Cir], cert denied 429 US 1025; United States v Spinks, 470 F2d 64 [7th Cir], cert denied 409 US 1011; Metropolis v Turner, 437 F2d 207 [10th Cir]; but cf. United States v DiGilio, 538 F2d 972 [3d Cir], cert denied sub nom. Lupo v United States, 429 US 1038) and the Supreme Court of the United States has similarly recognized it (Parker v Randolph, 442 US 62, supra). Indeed, one observer has interpreted the plurality opinion in Parker as holding that, as long as the defendant has confessed, "interlocking” is not required (see, Dawson, Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices, 77 Mich L Rev 1379, 1421; but see, Parker v Randolph, 442 US 62, supra, at p 75).
Confessions are "interlocking” if their content is substantially similar (People v Smalls, 55 NY2d 407, 415; People v Safian, 46 NY2d 181, 184, supra; Forehand v Fogg, 500 F Supp 851, 853; compare, People v McNeil, supra, at p 552 ["almost identical”]). The statements need not be identical, it is sufficient that both cover all major elements of the crime involved (see, People v Woodward, 50 NY2d 922; People v Berzups, 49 NY2d 417, 425; Tamilio v Fogg, 713 F2d 18, 20) and are "essentially the same” as to motive, plot and execution of the crimes (United States ex rel. Ortiz v Fritz, 476 F2d 37, 39; Forehand v Fogg, supra; cf. United States v Kroesser, 731 F2d 1509). Statements are substantially similar when defendant’s confession is close enough to the codefendant’s with respect to the material facts of the crime charged to make the probability of prejudice so negligible that the end result would be the same without the codefendant’s statement (People v Berzups, supra, at p 425; People v Safian, supra, at p 188; see also, People v Fisher, 249 NY 419, 426, supra). Confessions do not "interlock”, however, if a codefendant’s confession may be used to fill material gaps in the necessary proof against defendant (see, People v Smalls, supra; People v Burns, 84 AD2d 845).
The two sets of confessions before us interlock. There are differences, of course. There always will be, given human nature, the variations in human recall and the manner in which witnesses testify. Indeed, as a practical matter the evidence of witnesses is usually more suspect if their testimony harmonizes too closely. *71 But the Cruz brothers agreed, in their separate statements, on the date and target of the crime, the participants in it, the motive of robbery, and the essential facts of how defendant was injured and the station attendant killed. Although Benjamin’s statement was substantially longer, the details included did not contradict or modify the essential elements of defendant’s statement. The content of the confessions in Brims was markedly different, more because Sheryl Sohn had not entered the house and did not know or apparently contemplate that homicides would occur. But to the extent of her knowledge of the crime, her statement fully interlocked with defendant’s two confessions. Thus, she described the agreement with defendant and Sheffield, the several trips to the house to provide entry and the arrangement for disposition of the jewelry. Sheryl’s confession, admissible only as to her, could hardly have prejudiced defendant whose recitation in his confession of the same events she described was substantially similar. Indeed, it is difficult to perceive how Sheryl’s confession, which described only the preliminary arrangements with defendant, could have a "devastating” effect on defendant in view of his two confessions reciting the gory events that took place once he and Sheffield entered the Sohn home and murdered Sheryl’s parents (cf. People v Smalls, supra).[1]
Defendants’ major complaint is not that the content of the confessions was dissimilar but that they differed in reliability: in the Cruz case Benjamin’s 22-minute videotaped confession to the police was contrasted with defendant’s oral confession to a friend with a possible motive to falsify[2] and that was not revealed to the police for five months; in Brims a written confession to police officers was compared to oral confessions to, first, an accomplice who was extended leniency by the prosecutor and, second, a fellow prisoner awaiting disposition of the charges against him.
The contention that the exception to the Bruton rule for interlocking confessions does not apply when the confessions differ as to reliability has been rejected by this court (see, People v Woodward, 50 NY2d 922, affg 66 AD2d 866 [see, dissenting opn of Shapiro, J., for facts, at p 866]) and other courts (see, People v Santa *72 nella, 63 AD2d 744, lv denied sub nom. People v Tamilio, 45 NY2d 784, cert denied sub nom. Tamilio v New York, 443 US 912; Tamilio v Fogg, 713 F2d 18, revg 546 F Supp 364, supra). Indeed, when the rule was announced it was both anticipated that there would be differences in the scope and reliability of the confessions, and accepted that such differences would be tolerated (see, dissenting opns in People v McNeil, 24 NY2d 550, supra; and Parker v Randolph, 442 US 62, supra). Thus, decisions following the McNeil case have held that the use of the confessions is not foreclosed because one confession is oral and the other is written (People v Woodward, supra; Parker v Randolph, supra) because one is made to police officers and the other to lay witnesses (Tamilio v Fogg, supra), or because one is long and the other is short (see, People v Woodward, supra; People v Safian, 46 NY2d 181, supra). Nor is the rule any different because defendant repudiates his confession or challenges its voluntariness. None of the confessions in these two prosecutions was unreliable as a matter of law and once admissibility was determined by the court, credibility was a question for the jury (People v Woodward, supra; People v Anthony, 24 NY2d 696; United States ex rel. Dukes v Wallack, 414 F2d 246, 247; United States ex rel. Catanzaro v Mancusi, 404 F2d 296, supra).
Defendant Cruz argues that, quite independent of any error in ruling on his constitutional right of confrontation, he is entitled to reversal because the trial violated fair trial standards applicable to trials in New York involving multiple defendants and the violation resulted in "injustice or the impairment of substantial rights” (see, People v Payne, 35 NY2d 22, 26-27, supra; People v La Belle, 18 NY2d 405, 409, supra; People v Fisher, 249 NY 419, 427, supra; People v Evans, 99 AD2d 452). Defendant’s right under that standard is broader than his right to confrontation. It may be violated even where the codefendant has remained silent both before and during the trial or conversely has chosen to testify. A defendant’s right to a fair trial is not impaired, however, when there is substantial evidence of guilt independent of the codefendant’s statement (see, People v Fisher, supra, at p 426), or when the defendant has himself made inculpatory admissions substantially identical to those offered against him, and that admission, properly corroborated, establishes the crime (see, People v Snyder, 246 NY 491), i.e., when the error is harmless or when there is no substantial risk of prejudice. Defendant’s fair trial rights are violated, however, when he is prevented, because of the complexities of a joint trial, from presenting exculpatory evidence (see, People v *73 La Belle, supra), or when, although defendant’s right to confrontation has not been impaired, his codefendant’s confession includes material evidence of crime which results in substantial prejudice to defendant by filling gaps in the evidence against him. Thus, in Payne a severance was ordered because defendant’s confession implicated him in lesser criminal activity, but did not resolve the question of whether he was guilty of felony murder. The court found a substantial risk that the missing evidence could be filled, and apparently was, by reference to the codefendant’s confession (People v Payne, supra).
The statement of defendant contained all the necessary elements to incriminate him in the felony murder. It interlocked with Benjamin’s statement and it was corroborated by independent evidence sufficient to warrant the jury in accepting it as true and sufficient to support a guilty verdict. That being so, the trial court could properly deny severance finding, in the sound exercise of its discretion, that there was no substantial risk that the jury would borrow information from Benjamin’s hearsay statement to fill gaps in the evidence against defendant. If defendant was prejudiced by the joint trial, the prejudice resulted not from the fact that Benjamin’s statement added substantial weight to the proof of defendant’s guilt but from the fact that the denial of a severance prevented defendant from obtaining a more favorable atmosphere in which to attack his confession. That may have harmed his case tactically, but it did not deny his fundamental right to a fair trial (see, United States v Losada, 674 F2d 167, 171; United States v Werner, 620 F2d 922, 928).
Somewhat similar to defendant Cruz’s fair trial claim is defendant Brims’ claim that he was prejudiced because he was prevented from calling Sheryl Sohn as a witness. There was nothing before the court, however, to indicate that Sheryl would testify for defendant or that her testimony would tend to exculpate him if she did (see, People v Owens, 22 NY2d 93, 97-98; People v Kampshoff, 53 AD2d 325, 338, cert denied 433 US 911).
Finally, defendant Brims contends that the defendants’ defenses were antagonistic. A claim of antagonism may arise from a variety of circumstances, not easily cataloged, but it is clear that severance is not required solely because of hostility between the defendants, differences in their trial strategies or inconsistencies in their defenses. It must appear that a joint trial necessarily will, or did, result in unfair prejudice to the moving party and substan *74 tially impair his defense (People v La Belle, 18 NY2d 405, supra; People v Papa, 47 AD2d 902; see generally, Antagonistic Defenses as Ground for Separate Trials of Codefendants in Criminal Case, Ann., 82 ALR3d 245; Dawson, Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices, 77 Mich L Rev 1379, 1422-1425). Indeed, some courts have looked to see if the defenses are directly and mutually antagonistic before granting a severance, believing that the accuseds are not entitled to separate trials if one defendant seeks to exculpate himself by inculpating the other (see, Rhone v United States, 365 F2d 980; People v Braune, 363 Ill 551, 2 NE2d 839).
It was Brim¿’ contention at trial that he was innocent of the crime, that he had seen Sheryl Sohn that evening, but that he had been in New York City obtaining drugs and returned only after the murders had been completed. He claimed that he obtained the Sohn jewelry from a friend of Sheryl’s in exchange for supplying her with drugs. Sheryl Sohn’s principal defense was to contest the voluntariness of her confession for, without it, there was no case against her. Failing this, she sought to establish that she did not actively participate in the robbery-murder and that she did not know the perpetrators would be armed. There were a few questions designed to establish that she acted out of fear of Brims because of money she owed him for prior drug transactions, but the evidence of duress was so slight that counsel neither argued the point in the summation nor requested a charge on it. Despite defendant’s general claims that Sheryl Sohn’s presence in the trial impeded his defense or reflected unfairly on him by causing the jury to unjustifiably infer he was guilty, there is nothing before us to establish that he was prevented from presenting exculpatory evidence by the court’s desire to protect his codefendant’s rights. His present claim that he was prevented from establishing that he received the jewelry from Sheryl as payment for her prior drug purchases is contrary to his testimony at trial.
Accordingly, in each case, the order of the Appellate Division should be affirmed.

. On a related point made by defendant Brims, there was no error in receiving his two confessions although they differed in minor detail. Neither was hearsay as to him.

. Defendant speculates that Norberto may have sought revenge against him for the death of Jerry Cruz. There is nothing in the record to support that claim.