■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS PITTS, Appellant.—Judgment, Supreme Court, New York County (Clifford A. Scott, J., at jury and sentence), rendered June 26, 1984, which convicted defendant of two counts of murder in the second degree (intentional murder), two counts of murder in the second degree (felony murder), robbery in the first degree, burglary in the first degree, criminal use of a firearm in the first degree, criminal possession of a weapon in the second degree, and sentenced him to four terms of 25 years to life, four terms of 12½ to 25 years,

one term of 5 to 15 years, all to run concurrenty, modified, on the law, the convictions on the two counts of intentional murder reversed and to that extent the matter is remanded for a new trial, and, as modified, otherwise affirmed.

Defendant Thomas Pitts and his codefendants Jeffrey (Stevie) Waldo and Tyrone Jones were jointly indicted, tried, and convicted of two counts of second degree intentional murder, two counts of second degree felony murder, and other crimes committed during the robbery of Alfonzo Randolph, a narcotics dealer, and Ernest Davis, his overnight guest, in Randolph's Manhattan apartment the night of December 10, 1982. Defendant and his codefendants each gave written and videotaped confessions to the police, describing the events of that night, largely agreeing on how the crimes were committed but diverging, not surprisingly, as to the various roles each assumed. Both Waldo and Jones implicated defendant as the one who shot Randolph and Davis. Defendant's confessions indicated that he initially acted as the "lookout", entered the apartment, searched the refrigerator, and was at least present when Randolph, the second victim, was shot. Defendant's motion for a severance was denied and these confessions were admitted into evidence at the trial, with limiting instructions.

At the outset, the People concede, as they must, that since the nontestifying codefendants' confessions accused defendant of personally shooting the victims, their admission into evidence at trial violated defendant's Sixth Amendment right to confrontation of witnesses and entitles him to a reversal of the intentional murder convictions and a new trial on those counts. *(Lee v Illinois,* 476 US —, 106 S Ct 2056 [1986]; *Bruton v United States,* 391 US 123 [1968]; *People v Smalls,* 55 NY2d 407, 415 [1982].)* The rationale for the *Bruton* rule is that "a confession that incriminates an accomplice is so 'inevitably suspect' and 'devastating' that the ordinarily sound assumption that a jury will be able to follow faithfully its instructions could not be applied. *Bruton [v United States],* 391 US [123], 136". *(Lee v Illinois, supra,* at —, at 2063.) On this appeal we are called upon to decide whether the evidence is legally sufficient to sustain defendant's indictment for the charges of intentional murder, and, as to the felony murder and nonhomicide charges, whether the admission of the codefendants' confessions violated defendant's right to confrontation or tainted the fairness of the trial, entitling him to reversal and a new trial on those charges.

At about 5:30 A.M., a neighbor looked inside the open door of Alfonzo Randolph's apartment and saw his body on the bed

with his hands bound and what looked like a towel around his head. The body of Ernest Davis was on the floor, blocking the door. Both victims had apparently been shot in the head at close range through a pillow, Randolph once, Davis twice. During the subsequent police investigation Jeffrey Waldo surfaced as a prime suspect. Police lured Waldo to the 120th Precinct in Staten Island. Waldo arrived with his friend, codefendant Tyrone Jones. Both were questioned separately and ultimately made written and videotaped confessions. In his written statement, Waldo indicated that on December 10, 1982, at about 9:30 P.M., he, defendant, and Jones went to 117th Street and Manhattan Avenue where Al (Randolph) lived. Al looked out the window, and threw the key down to Waldo, who went upstairs. Waldo bought drugs from Al, then he, defendant, and Jones "got high."

Later, defendant suggested that they go back to Al's apartment to rob Al, who was a narcotics dealer and had a lot of money. They returned to Al's building at about 11:30 P.M. Al threw the key down to defendant after another man, whom defendant knew from Clinton, said it was okay. Waldo and Jones, both of whom had been hiding in the hallway, went upstairs with defendant.

Inside the apartment, after Waldo asked Al for drugs, defendant took out a small automatic and pushed Al on the bed. Jones tied Al with a telephone cord, and defendant tied up the other man. In the meantime, Waldo found $750 and two quarter bags of drugs. As they were about to leave, defendant said that he "knew the dude from jail." Defendant put a pillow over Al's head and shot him once, then shot the other man twice through a pillow. They went back to Staten Island and divided the proceeds so that each received $250 and some drugs. The only essential difference in the scenario recounted by Jones was that Jones referred to the third person as "T", and omitted to mention Waldo's initial drug purchase from Randolph. He said that when they were in the apartment, "T" told him to tie up the old man, and Stevie looked for money. "T" kept saying "I know the dude, I know the dude", then Jones says "T" shoot the man who was near the door through a pillow. Afterwards, "T" said he had to shoot the man because he knew where "T" lived.

In his videotaped statement Waldo added that Al Randolph recognized him when he threw him the key prior to the drug transaction earlier that night. Jones added, in his videotaped statement, that when they all went to rob Al, "T" looked around Al's apartment as if he knew where everything was.

Jones also said that after the robbery, "T" sat in the front of the car, playing with the gun, "laughing and you know smilin' about it. I look, what the hell's going on you, what's going on, is he buggin' out or what."

Defendant was apprehended as a result of a trap Waldo set for his capture. A detective shot defendant, wounding him in the arm, when, on her command not to move, he appeared to reach for a gun. Although defendant ran and escaped, he was found in a nearby building and taken to a hospital, where he was treated by physicians, and given medication to alleviate his pain. When police first advised defendant that Waldo and Jones had implicated him in the murders of Randolph and Davis, he declined to make a statement. His mother's brief visit with him at the 120th Precinct in Staten Island apparently upset him. Later, during the drive to the 26th Precinct in Manhattan where he was being transferred, he volunteered to talk. He gave an oral confession after receiving *Miranda* warnings. Upon arriving at the 26th Precinct, eating, and taking pain medication, and after the *Miranda* warnings were repeated, at about 1:30 P.M., defendant agreed to reduce the oral statement to writing.

Defendant's written statement was as follows: "On 12/10/82, at approximately 7:30 p.m. I was present at my sister Arlene Tillman's house, 280 Park Hill Avenue, Staten Island, apartment 2N. At about 8:00 p.m., Stevie Waldo, who is my sister's boyfriend, came into the house. Tyrone, last name unknown, who was a friend of Stevie's came into the house with me about 7:30 p.m. After a short while, Stevie goes in one of the rooms and comes out with a .25 caliber automatic and a shotgun. He gives the shotgun to Tyrone and puts the pistol in his pocket. At this time I asked Stevie what's with the guns, and he says me and Tyrone is going to do something and we want you to look out. I said, all right, since I don't have to do anything. At about 9:00 p.m., Stevie, Tyrone and I leave my sister's house in a gray Chevy that Stevie borrowed from someone. We then go to Queens and Stevie goes to some store to pick up some money while Tyrone and I wait in the car. At about 10:15 p.m., we leave Queens and go to 96th Street and FDR Drive to kill some time. After a short while, we had up 116th Street and Harlem and Stevie stops the car and makes a phone call. Stevie then parks the car and Tyrone gets out and goes into a building. Stevie tells me to stand on the corner and look for anybody who comes into the building. Stevie looks up to a second floor window and a guy throws out a key. I waited about three minutes, and then I go into the

building. I went to a door where I hear voices coming from, and put my ear to it and I hear Stevie saying he wanted to buy some quarters. I then heard someone say this is a stickup, get on the floor, and I then go into the apartment and see Tyrone tying up the dude near the entrance door. At this I see Stevie with two quarters of dope in his hand that he got from the refrigerator, and he tells me again to check the refrigerator, but there was nothing there. The old man who was selling the dope was tied up on his stomach and Stevie said, where is the box at, and the man said he got rid of the box. At this time Stevie said stop lying to me, stop lying to me. Stevie then said, if you don't tell me where the box is, I am going to kill you. The old man said, please, Stevie, don't kill me, and then he said Stevie, the box is in the closet over there. Please don't kill me. Stevie then got the box and then walked over to the old man, put a pillow over his head and shot him one time with a .25 caliber automatic. What I failed to mention earlier is when I first go into the apartment, I hear one shot, and then I see the dude by the door shot in the head with a pillow over him. After those guys are shot, Stevie grabs the metal box and then puts the pistol in his pocket, and Tyrone puts the shotgun in his waist, and we all walk out. We then go back to the car, and go to Staten Island. We went to Wagner College and parked at the road and Stevie opens the trunk and take out the jackhandle, and pries open the combination money box. Stevie dumps everything into a paper bag, and we leave. We then go to Stevie's common law wife, Quentella's house at 280 Park Hill Avenue and split the money. I got $200.00 out of the deal and him and Tyrone got the rest. I left and went to my girl Tracy's house. There was a thousand dollars cash money and jewelry."

Later that evening, after the arrest was completed, an Assistant District Attorney advised defendant of his *Miranda* rights, and conducted a videotape interview of him. His video-taped statement largely corroborated his written statement except that he claimed to have been outside the apartment door when he heard the shot that killed Davis. He stated that after he heard the shot, the door to the apartment "swung open", and he saw Waldo standing over and pointing a gun at a body on the floor. He also added that he had been released from prison a few days before the crime was committed, and had just met Waldo and Jones after his release.

We conclude that the evidence admissible against defendant is legally sufficient to sustain his prosecution for intentional murder, justifying a new trial on those charges.

As to the felony murder and nonhomicide convictions, we conclude that there must be an affirmance. Defendant's confessions and reasonable inferences drawn therefrom established his active participation in the felony murder *(see, People v Warner,* 119 AD2d 841 [2d Dept 1986]) and the underlying robbery and other crimes and the absence of an affirmative defense to felony murder beyond a reasonable doubt. *(See, People v Pearson,* 118 AD2d 737 [2d Dept 1986].)

Defendant's contention that these convictions must be reversed because the jury's consideration of his claim that his confession was involuntary was tainted by the improperly admitted confessions implicating defendant in intentional murder lacks merit. It is well settled that a codefendant's confession may be introduced at a joint trial without violating the spirit of the rule in *Bruton v United States (supra),* where the implicated defendant himself has made a confession close enough to the codefendant's with respect to the material facts of the crime charged to make the possibility of prejudice so negligible that the end result would be the same without the codefendant's statement. *(People v Safian,* 46 NY2d 181, 188 [1978], cited in *People v Berzups,* 49 NY2d 417, 425 [1980].) As the Court of Appeals explained in *Berzups (supra,* at 425): "The justification for this exception is that separate confessions, without being mirror images of one another, may yet be so duplicative in their description of the crucial facts that the one of the nontestifying codefendant may be of no measurable consequence in the face of the overwhelming and largely uncontroverted evidence contained in the interlocking confession of the defendant himself *(Brown v United States,* 411 US 223; *Schneble v Florida,* 405 US 427; *Chapman v California,* 386 US 18)."

In the present case, the codefendants' confessions simply duplicated defendant's admission of the facts which proved the felony murder and the underlying crimes, i.e., his active participation in the robbery, his knowledge that loaded weapons were to be used, and his receipt of a share of the proceeds. Therefore, in respect to these crimes the codefendants' confessions were admissible because they "interlocked" with those made by the defendant. The codefendants' confessions were of "no measurable consequence in the face of the overwhelming and largely uncontroverted evidence" provided by defendant's own confession. *(People v Berzups, supra,* at 425.)

The codefendants' accusations that defendant was the shooter and the mastermind of the robbery do not undermine the "interlocking" nature of the confessions since these facts

have no bearing upon defendant's guilt of the felony murder and the underlying crimes. *(People v Berzups, supra; People v Martinez,* 121 AD2d 475 [2d Dept 1986]; *People v Green,* 101 AD2d 954 [3d Dept 1984].) The discrepancies between the codefendants' confessions and those of the defendant only concern disputed issues key to the intentional murder charges.

Even if the confessions are not "interlocking", in our view defendant's own confession established his guilt so overwhelmingly that the admission of his codefendants' confessions, even if error, was harmless beyond a reasonable doubt. *(See, Tamilio v Fogg,* 713 F2d 18, 21 [2d Cir 1983].) In *People v Cruz* (66 NY2d 61, 73 [1985]), the court considered and rejected the identical claim made by defendant in the present case, that the admission of the codefendant's confession impaired the right to a fair trial because it prejudiced the jury's consideration of the issue of whether the defendant's confession was voluntary. In language which has persuasive application to the present case, the court there stated *(supra,* at 73): "If defendant was prejudiced by the joint trial, the prejudice resulted not from the fact that Benjamin's statement added substantial weight to the proof of defendant's guilt but from the fact that the denial of a severance prevented defendant from obtaining a more favorable atmosphere in which to attack his confession. That may have harmed his case tactically, but it did not deny his fundamental right to a fair trial *(see, United States v Losada,* 674 F2d 167, 171; *United States v Werner,* 620 F2d 922, 928)." Concur—Kupferman, J. P., Ross, Carro, Asch and Rosenberger, JJ.