*180 OPINION OF THE COURT
Kaye, J.
In a case involving a staged theft of Persian antiquities, with the objective of recovering $18.5 million in insurance proceeds, the central issues on appeal are. whether joint trial of the two defendants was proper, and whether the acts charged amounted to attempted grand larceny and burglary.
L
Viewing the evidence in the light most favorable to the People, the proof was sufficient to show that the defendants entered into a conspiracy to stage a burglary of defendant Houshang Mahboubian’s collection of gold and silver Persian antiquities. Three art experts testified for the People that several pieces in the collection were of dubious authenticity, and indeed almost certainly modern forgeries. From the testimony of other witnesses, the jury could have concluded that Mahboubian became aware of this before the burglaries, and had been unsuccessful in his efforts to sell the collection.
In the summer of 1985, Mahboubian insured the collection with Lloyd’s of London for $18.5 million, covering it while in transit for a 12-month period. The stated purpose for the insurance was to allow Mahboubian to ship the collection to the United States, where it would be offered for sale. In October, Mahboubian traveled to New York where he rented a vault at Morgan Brothers Manhattan Storage, a long-term storage facility. According to the assistant warehouse manager, codefendant Nedjatollah Sakhai accompanied him to Morgan Brothers. A month later, the day after he returned from a trip to London, Sakhai too rented a vault at Morgan Brothers, attempting unsuccessfully to get space on the same floor as Mahboubian’s vault.
In early December 1985, Sakhai contacted Abe Garabedian, who in turn spoke to several men experienced in robberies and burglaries of art storage facilities. Garabedian told them that Sakhai had "an insurance job” for them. Unbeknownst to the others, one of the men — Daniel Cardebat — had agreed to act as a police informant, and secretly recorded all of their conversations with Sakhai.
When Cardebat and the others first arrived at Sakhai’s New York City antiques store to discuss the job, Sakhai was speaking in Farsi on the telephone to someone in London named *181 Houshang about a "job” that "they will do.” Telephone company records established that Sakhai placed a call to Mahboubian’s London gallery at that time. After hanging up, Sakhai explained to them that the job involved stealing a number of crates that would be flown from Switzerland to New York City and that he was leaving that night to "finalize everything with the guy.” They accepted his offer of $100,000 for the theft. Three days later, Sakhai flew to England.
A few weeks later, Mahboubian came to New York City and made arrangements for his collection to be handled upon arrival by W.R. Keating Company — a customs brokerage firm —and then stored at Regency Worldwide Packing, a secure art packing and customs warehouse, where customs inspection and clearance would be conducted. Mahboubian was given a full tour of the Regency, during which he was told that his shipment would not be stored in the open warehouse, but would be placed inside a special steel-vaulted room. While Mahboubian was in New York, telephone calls were made between his number and Sakhai’s. In addition, right before Mahboubian’s tour of the Regency warehouse, Sakhai met with Cardebat and Daniel Kohl, another of the hired thieves, and informed them that the shipment would be taken from Swissair to Regency for customs clearance, and then to Morgan Manhattan. During the meeting, Cardebat recorded another telephone conversation in Farsi in which Sakhai requested "the specifications from there.” After hanging up, Sakhai told the others that the caller was "him” and that "he” was "going right now” to "find out where they’re gonna be at the Regency.”
Mahboubian then flew to Switzerland and visited the warehouse where his collection was stored. While there, in an unusual procedure, he marked his initials in red on the shipping crates in which it was packed; Sakhai had earlier told Cardebat and the others that that would be done. The crates were shipped to New York on December 24, 1985 and transferred to Regency the next day. Within 24 hours, two more telephone calls were made from Sakhai’s house to Mahboubian’s number, and Sakhai had met with Cardebat and the others to inform them that the marked boxes were at the Regency. There was an unresolved discussion concerning whether the theft would take place at the Regency or later at Morgan Manhattan. Sakhai drew the others a diagram showing where the collection would be stored at Morgan Manhattan in Mahboubian’s seventh floor vault, and told them he had *182 a key but preferred not to use it. The goods were cleared by customs the next day.
Sakhai met with the thieves again at the beginning of January. This time, he insisted that the burglary take place at the Regency, immediately. He also told them that it would ruin the entire plan even if one item went on the market, and that he had given his "word of honor that the whole thing is going to be returned to him.” Sakhai showed the men a diagram of the Regency’s warehouse floor, indicating that Mahboubian’s crates were stored in the inner steel-vaulted room where Mahboubian had been told they would be placed when he toured the facility.
Two nights later, the burglary took place. Cardebat and his accomplice knocked down a retaining wall to gain entry. Inside, Cardebat found the room Sakhai had pointed out on his diagram and broke down its steel doors, but could not locate the boxes. He found them a few seconds later right outside the vault; Regency personnel had never in fact put the boxes inside the vault. Cardebat passed the boxes out of the warehouse to his colleagues, and the men began to remove the pieces from them. At that point, they were arrested by members of the Manhattan Robbery Task Force, who had been alerted by Cardebat and had observed the theft from the beginning. Cardebat telephoned Sakhai from the precinct on the pretext of arranging for delivery of the stolen goods, and agreed to meet him at La Guardia Airport. Sakhai was arrested on his way there. Mahboubian was not charged with participation in the crime until several months later, after he had been interviewed by an Assistant District Attorney and allegedly made a number of significant misrepresentations about his arrangements to ship and store his collection.
This evidence in our view was sufficient for the jury to find that both defendants had conspired, as charged, to stage a burglary and fraudulent theft in order to collect the insurance proceeds covering Mahboubian’s collection. We therefore reject defendants’ claims that their convictions for burglary, attempted grand larceny and conspiracy must be reversed for insufficiency and the indictment dismissed.
IL
Passing to the remaining issues of law, we first address the claim, made by both defendants, that reversal and a new trial are compelled because their defenses were antagonistic *183 and their motions for severance should have been granted. Both defendants timely moved, pursuant to CPL 200.40, to be tried separately on the ground that they would be unduly prejudiced by a joint trial, and they argue on appeal that denial of their motions was an abuse of discretion. We conclude that this claim has merit.
As neither defendant disputes, the charges against them were properly joined in a single indictment: they were jointly charged with every offense alleged in the indictment, the offenses were based on a common scheme or plan, and the offenses charged were based upon the same criminal transaction (CPL 200.40 [1]). Given the concededly proper joinder, defendants’ motions for separate trials were addressed to the discretion of the trial court, which may "for good cause shown” order severance. Good cause under the statute includes, but is not limited to, a finding that a defendant "will be unduly prejudiced by a joint trial.” (CPL 200.40 [1].)
The decision to grant or deny a separate trial is vested primarily in the sound judgment of the Trial Judge, and defendants’ burden to demonstrate abuse of that discretion is a substantial one. Moreover "[w]here proof against the defendants is supplied by the same evidence, only the most cogent reasons warrant a severance.” (People v Bornholdt, 33 NY2d 75, 87.) While that is particularly true where the defendants are charged with acting in concert, in all cases a strong public policy favors joinder, because it expedites the judicial process, reduces court congestion, and avoids the necessity of recalling witnesses (Parker v United States, 404 F2d 1193, 1196). In balancing these policy considerations against defendants’ claim of undue prejudice, we therefore also consider that the trial in this case lasted five weeks and required the testimony of several foreign and out-of-State witnesses.[1]
The essence of each defendant’s argument is that he was prejudiced by the joint trial because his defense was "antagonistic” to that of his codefendant. We have not often had occasion to consider the question under what circumstances antagonism in the defenses advanced by jointly tried defendants will result in such prejudice as to require reversal. Some *184 degree of prejudice is of course inherent in every joint trial. But that alone does not outweigh the factors favoring joinder of defendants; more is required. CPL 200.40 refers to undue prejudice, and in People v Cruz (66 NY2d 61, revd on other grounds and remanded 481 US 186, on remand 70 NY2d 733), we spoke of unfair prejudice. As we recognized in Cruz, "severance is not required solely because of hostility between the parties, differences in their trial strategies or inconsistencies in their defenses. It must appear that a joint trial necessarily will, or did, result in unfair prejudice to the moving party and substantially impair his defense”. (66 NY2d, at 73-74; see generally, Dawson, Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices, 77 Mich L Rev 1379, 1422-1426 [1979].)
Whatever word encapsulates the legal conclusion — whether "undue,” or "unfair,” or "compelling” prejudice — in this State the level of prejudice required to override the strong public policy favoring joinder has not been reduced to any set formula readily applicable in all cases; the inquiry is necessarily fact-specific. Broadly speaking, two tests have emerged for determining when defenses are sufficiently antagonistic to require severance. One, typified by a series of Fifth Circuit cases culminating in United States v Romanello (726 F2d 173), looks in large measure to whether the defenses are logically inconsistent — that is, whether the "core” of each defense is rationally irreconcilable with the other. "The essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other.” (Id., at 177.) The second, typified by Rhone v United States (365 F2d 980) and subsequent D.C. Circuit cases interpreting Rhone, looks to whether there is a danger that the jury will unjustifiably infer defendants’ guilt simply from the conflicting and irreconcilable defenses; formal inconsistency in defenses would not necessarily compel severance.
We apply a standard that combines elements of both tests, concluding that severance is compelled where the core of each defense is in irreconcilable conflict with the other and where there is a significant danger, as both defenses are portrayed to the trial court, that the conflict alone would lead the jury to infer defendant’s guilt. In that motions for severance typically arise at the pretrial stage or in the course of trial, the trial court must apply this standard prospectively, based on its discretionary assessments of the strategies and evidence as *185 forecast by the parties. Appellate courts, in reviewing those discretionary determinations (see, by analogy, People v Sandoval, 34 NY2d 371) obviously have the benefit of the full trial record by which they may, within the ambit of their respective review powers, determine the existence of irreconcilable conflict and its possible effect on the verdict.
As was made plain from the outset, Mahboubian’s defense was to deny any participation in the crimes. While he did not testify at trial, he argued through counsel that any information Sakhai had from him concerning the shipment must have been elicited by tricking him into inadvertently revealing those details in the course of conversations about their other business dealings. Mahboubian’s witnesses testified either that his collection was genuine, or that at least he had no reason to think otherwise.
Sakhai’s defense was that there was no intent to defraud Lloyd’s. While he also did not testify at trial, Sakhai defended himself through counsel by admitting his participation in the theft of Mahboubian’s collection — he would have been hard pressed to deny it in light of his taped conversations — but arguing there was no evidence of an insurance fraud, and the People’s expert testimony about Mahboubian’s collection was inconclusive at best. Sakhai suggested that both he and Mahboubian had arranged the theft as a publicity stunt, to enhance the value of Mahboubian’s pieces; in any event, that is what he had believed to be the case, whether or not Mahboubian was using him as an unwitting dupe. Sakhai’s witnesses were a customs broker who testified that Sakhai had previously made arrangements through him for Mahboubian to bring other art objects into this country, and an investigator who testified that after the arrests he had opened the lock of Mahboubian’s vault at Morgan Manhattan with a key Sakhai gave to him.
We agree with defendants that their defenses were not only antagonistic but also mutually exclusive and irreconcilable. The jury could not have credited both defenses. Sakhai conceded the theft. If the jury had believed that Mahboubian persuaded him to arrange the theft as a publicity stunt, they could not have also credited Mahboubian’s disclaimer of any involvement. Had the jury credited Mahboubian’s disclaimer of any involvement, necessarily they had to reject Sakhai’s defense. This was more than complete disagreement on some factual detail, or even some peripheral aspect of the case (see, *186 e.g., United States v Sheikh, 654 F2d 1057, 1065). The defenses presented here were antagonistic at their crux.
This central theoretical conflict between defendants was exemplified when at trial Sakhai called a witness — an investigator — to testify concerning Sakhai’s possession of a key to Mahboubian’s Morgan Manhattan vault. The purpose of this testimony was to demonstrate that, contrary to Mahboubian’s contention, he had dealings with Sakhai concerning the shipment of his collection. In turn, Mahboubian, in his effort to undermine Sakhai’s claim of joint involvement, elicited testimony from a Regency employee that he had seen and even spoken to Sakhai on the Regency premises, testimony counsel later used to argue that Sakhai could and did plan the robbery without any information provided by Mahboubian. The summation of each defendant was in principal part devoted to discrediting the other. Mahboubian urged that he was not part of Sakhai’s illegal scheme but rather an innocent dupe, as evidenced by the fact that much of Sakhai’s information about the shipment was glaringly wrong; Sakhai argued that the only sensible explanation for what occurred was that the theft was intended as a wild publicity stunt, or that he was Mahboubian’s innocent dupe.
In our view, this conflict of defenses — which was brought to the court’s attention before trial began — created the sort of compelling prejudice that could have been avoided by the grant of the requested severance. The People’s proof of the conspiracy and attempted grand larceny charges was largely circumstantial. There was a substantial possibility that defendants’ presentation of antagonistic defenses with respect to how each defendant explained that proof caused the jury to infer that the conflict itself demonstrated both defendants’ guilt. In other words, in a case of directly conflicting defenses such as this, there was a significant possibility that the jury unjustifiably concluded by virtue of the conflict itself that both defenses were incredible and gave undue weight to the government’s evidence. Under those circumstances, defendants were denied a full opportunity to present their defenses, and did not receive a fair trial.
IIL
In addition to the claims of both defendants for severance based on antagonistic defenses, Mahboubian separately argues that he was unduly prejudiced at the joint trial, when, *187 out of concern for a possible Bruton problem with respect to Sakhai, large portions of his statement to an Assistant District Attorney were redacted. Our review of the record indicates that Mahboubian did indeed suffer undue prejudice as a result of the redaction.
When Cardebat and his associates were arrested, the police and later the prosecutor took possession of Mahboubian’s collection of artifacts. Despite Mahboubian’s demands, the District Attorney refused to release the collection until he was satisfied that Mahboubian had played no part in the robbery scheme. To that end, accompanied by three lawyers, Mahboubian answered questions posed to him by an Assistant District Attorney during a four-hour session. The People sought to introduce Mahboubian’s statement at trial, asserting that it contained a number of demonstrable falsehoods evidencing Mahboubian’s consciousness of guilt.
Initially, the prosecutor sought to introduce the statement in its entirety. Sakhai strenuously objected, contending that it contained many inculpatory references to him, introduction of which would violate his right of confrontation as well as undermine his defense. Ultimately, the trial court and prosecutor determined that all references to Sakhai would be redacted, over the protests of Mahboubian, who claimed that those portions of the statement contained important exculpatory material. The redaction was performed, resulting in excision of roughly 58 pages of the 146-page statement, or slightly more than one third of it. As Mahboubian contends, and the People do not dispute, he would have been entitled at a separate trial to have the jury consider the entire statement (People v La Belle, 18 NY2d 405).
The excised portions of the statement were basically Mahboubian’s responses to a series of questions intended to explore his relationship with Sakhai and specifically, whether Sakhai might have acquired information about shipment and storage of the collection from him. In essence, Mahboubian responded by painting a portrait of Sakhai engaged in increasingly frantic efforts to ingratiate himself with his fellow art dealer around the time of the shipment. Mahboubian claimed that during the many conversations initiated by Sakhai, in response to the latter’s prompting, he had disclosed much of his arrangements. According to Mahboubian’s statement, he had given Sakhai the key to his Morgan Manhattan vault, in the ultimately vain hope that Sakhai would be permitted to *188 supervise transfer of the collection, so Mahboubian would not have to come to this country for that purpose.
This material was not "exculpatory” in the strictest sense, but we do not find that to be a crucial distinction between this case and People v La Belle (supra). It supported Mahboubian’s defense arguments and if believed, it explained much of the evidence against him, including the key produced by Sakhai’s investigator. Given the circumstantial nature of the People’s case against Mahboubian, we conclude that redaction of these areas of his statement, which would have provided the jury with an explanation for some of the evidence equally consistent with an inference of innocence as of guilt, was unduly prejudicial. While the People respond that the redaction actually favored Mahboubian because a few details of the excised answers were arguably inconsistent with his trial strategy, that contention is not dispositive; the great bulk of Mahboubian’s statement was entirely consistent with and supported his defense.
Thus, we conclude that the trial court abused its discretion in denying severance. We therefore reverse the convictions and order a new trial as to each defendant.
IV.
Wholly apart from the question of severance, both defendants contend that even if the People proved all of the allegations of the indictment, the acts they were charged with committing did not amount to an attempt to commit grand larceny or to a burglary. Contrary to the People’s argument, those contentions were preserved by defendants’ pretrial motions to dismiss on that precise ground, even though defendants did not specifically seek dismissal on that basis at the close of the People’s evidence.
With respect to the attempted grand larceny charge, defendants claim that the scheme to steal the proceeds of Mahboubian’s insurance policy from Lloyd’s not only was aborted short of fruition but also had not yet advanced to the point where, legally, their actions constituted an attempt. We disagree.
The substantive crime of attempt is a relatively recent development of the common law. The modern doctrine is said to date from Lord Mansfield’s decision in the case of Rex v Scofield (Cald 397) in 1784, and to have fully emerged in Rex v Higgins (2 East 5), where, citing Scofield, the court said "[A]ll *189 such acts or attempts as tend to the prejudice of the community, are indictable.” (Id., at 21.) (See generally, Sayre, Criminal Attempts, 41 Harv L Rev 821, 822-837 [1928].) As many commentators have noted, imposition of punishment for an attempt poses difficult questions for a criminal jurisprudence in which a basic premise is that bad thoughts alone do not constitute a crime. What justification, then, is there for punishing an attempt, when by definition the contemplated crime is not consummated? (See generally, Ryu, Contemporary Problems of Criminal Attempts, 32 NYU L Rev 1170 [1957].)
Commonly given answers are that persons who engage in attempts to commit a crime are as dangerous as those who succeed, and it would be unjust to punish only the latter; that law enforcement agencies should be encouraged to act before a crime is actually committed; and that criminal attempts are in and of themselves substantively harmful to society. Nonetheless, the right to think bad thoughts undeterred or unpunished by the criminal law has been protected by the requirement that in order to be punishable as an attempt, conduct must have passed the stage of mere intent or mere preparation to commit a crime.
Defendants contend that under the law of New York demarcating the boundary where preparation ripens into punishable attempt, their conduct had not gone far enough to subject them to liability for an attempt to commit grand larceny, for they had not yet reported any loss to Lloyd’s or filed an insurance claim when police intervention put an abrupt end to their scheme. According to defendants, their acts, including the forced entry into Regency and the removal of Mahboubian’s collection, must be characterized as mere preparation for the larceny, and while perhaps punishable in themselves, may not be punished as an attempt to commit a crime that would not be complete until they had taken additional steps. In essence, the argument made by defendants is that their actions failed to reach the level of an attempt in two related respects, either compelling reversal: (1) several steps, requiring time, remained to be taken; and (2) defendants could still have changed their minds and abandoned the scheme after the warehouse break-in. The cases do not support defendants’ contention.
The definition of a criminal attempt is found in Penal Law § 110.00: "A person is guilty of an attempt to commit a crime when, with intent to commit a crime, he engages in conduct *190 which tends to effect the commission of such crime.” On its face, the statute would appear applicable to defendants’ conduct, but in People v Di Stefano (38 NY2d 640, 652), we made clear that the revised Penal Law definition was not intended to eliminate the preexisting requirement that an attempt come " Very near to the accomplishment of the intended crime’ ” before liability could be imposed. Thus, the precise issue presented is whether defendants’ conduct came "very near” or "dangerously near” completion of the larceny, as that requirement has been interpreted (People v Rizzo, 246 NY 334, 338). As is apparent, the boundary where preparation ripens into punishable conduct depends greatly on the facts of the particular case.
To be sure, the strictest possible approach to defining an attempt would be to require that the defendants have engaged in the last proximate act necessary to accomplish the intended crime. It is settled, however, that the defendants’ act "need not be 'the final one towards the completion of the offense’ ”. (People v Bracey, 41 NY2d 296, 300, citing People v Sullivan, 173 NY 122, 133.)[2] Thus, the fact that defendants had not yet taken the final step necessary to obtain the insurance money does not mean that the steps they had taken could not constitute an attempt to do so. Similarly, the theoretical possibility that defendants might yet have renounced the criminal venture does not obviate their liability for an attempt, for that is true of any attempt interrupted by the police. People v Sullivan (supra) and People v Collins (234 NY 355) stand for the very different proposition that a defendant who has in fact abandoned the criminal plan may not be liable for an attempt (see also, Penal Law § 40.10). Here, however, there was no evidence that defendants had or would have voluntarily abandoned their scheme.
The necessity of further steps for completion of the crime and the possibility of abandonment or renunciation are factors to be considered in evaluating whether conduct has come *191 "dangerously close” to success, but are not dispositive. Those factors do not call for reversal in this case.
Where the boundary line between preparation and attempt should be placed differs with different crimes (People v Werblow, 241 NY 55, 61). Here, it is significant that defendants’ conduct went far beyond mere discussion of a crime (People v Di Stefano, 38 NY2d 640, supra), and beyond agreement to commit a crime (People v Warren, 66 NY2d 831), and even beyond arming themselves in preparation for a crime (People v Rizzo, 246 NY 334, supra). Defendants hired professional burglars, provided them with tools, and caused them to break into a warehouse and steal property in the dead of night. These acts encompassed the most hazardous and difficult portion of their criminal scheme. What remained to be done was reporting of the supposed theft to the insurer.
Defendants’ conduct had plainly "pass[ed] that point where most men, holding such an intention as defendant holds, would think better of their conduct and desist.” (Skilton, The Requisite Act in a Criminal Attempt, 3 U Pitt L Rev 308, 309-310 [1937].) Defendants’ actions in causing the nighttime break-in were potentially and immediately dangerous — a factor we weigh in considering whether they were "dangerously close” to the completed crime. Their activities had reached the point where police intervention was called for, lest the burglars escape or the collection disappear. Most important, defendants’ acts "had gone to the extent of placing it in their power to commit the offense unless interrupted”. (People v Sobieskoda, 235 NY 411, 419.)
We need not (and do not) adopt the Model Penal Code’s definition of an attempt as a "substantial step” toward completion of the crime (see, ALI Model Penal Code § 5.01) in order to conclude that some acts — even if preparatory in a dictionary sense — go sufficiently beyond "mere preparation” as to be properly characterized as an attempt for which criminal liability may be imposed. Thus, for instance, in People v Sobieskoda (supra) the defendants shot their intended victim’s brother, but fled before even firing at the target himself who remained some distance away. We held that the jury could find that their actions constituted an attempted murder of the target, because they had put it in the defendants’ power to commit the intended murder, if not interrupted. Under the analysis proposed by the dissent, on those facts there would be no attempt because (1) several contingencies remained before *192 effectuation of the crime; (2) the defendants could have changed their minds before doing any of those things; and (3) firing at the target’s brother was not an act that would have "naturally effect[ed] th[e intended] result” (see, dissenting opn, at 198). Indeed, we have explicitly recognized that there comes a point where it is "too late in the stage of preparation for the law to conclude that no attempt occurred.” (People v Mirenda, 23 NY2d 439, 446 [emphasis added].)
Perhaps the real source of our disagreement with the dissent lies in the fact that defendants had planned a complex crime that necessarily had to proceed in several stages removed in time and space from one another. Thus, the fact pattern here is rather different from more typical attempts, where the would-be robber or burglar is apprehended on the premises, tools of the trade in hand. Simpler crimes proceed directly from preparation to completion, but defendants’ scheme by its very nature involved a longer route.
Nevertheless, the principle remains the same: had defendants’ acts reached the stage where they were very near or dangerously near completion of the larceny? Unlike a burglar or robber on the premises, defendants may not have been physically within striking distance of success, yet in all but the most literal sense, they were. The steps they had already taken were more than substantial: they had secured insurance, arranged for shipment of the goods from Europe and storage in a particular New York City warehouse, and hired thieves who actually broke in and removed the goods. These steps took defendants to the point where only a few comparatively minor acts — all wholly within defendants’ own power— remained to be accomplished.
In the circumstances of this crime and this case, we therefore conclude that defendants’ conduct went sufficiently beyond mere preparation and, as the jury found, constituted attempted grand larceny.
V.
We likewise reject defendants’ contention that their convictions for burglary must be reversed for insufficient evidence of the requisite mental culpability.
Defendants’ burglary convictions were premised on their liability as accessories for the acts of Cardebat and his accomplices in breaking into the Regency warehouse and removing Mahboubian’s collection. Defendants argue that the evidence *193 was insufficient to prove their intent that Cardebat and company "commit a crime therein” — that is, within the warehouse — as required by Penal Law § 140.20. They argue that because the crime they were charged with having ultimately intended, the theft of the insurance proceeds, was not to be consummated within the warehouse, but at a different point in time and space, it cannot serve as the object crime under Penal Law § 140.20, and that the evidence does not support a finding that they intended the commission of any other crime.
In order to secure a conviction for burglary, the People need only allege and prove a knowing and unlawful entry coupled with an intent to commit a crime therein. There is no requirement that the People allege or establish what particular crime was intended, or that the intended crime actually be committed (People v Mackey, 49 NY2d 274, 278-281).[3] To prove defendants’ guilt as accessories, the People were required to demonstrate that defendants themselves acted with the mental intent required for commission of a burglary — intent that a crime be committed "therein” — when they solicited Cardebat and his colleagues to engage in conduct constituting a burglary (Penal Law § 20.00).
We need not reach defendants’ ultimate goal — the larceny from Lloyd’s — and whether the fact that it could not itself be committed on Regency’s premises relieves defendants of criminal liability for the unlawful entry that was an essential step toward fulfillment of their goal. There was sufficient proof that defendants intended that other crimes be committed while their hired helpers were inside the warehouse.[4] As the trial court held in denying defendants’ motions to dismiss on this ground, defendants intended that the crimes of criminal facilitation and attempted grand larceny be committed on Regency’s premises (People v Mahboubian, 136 Misc 2d 975).
A person is guilty of criminal facilitation when, "believing it probable that he is rendering aid * * * to a person who *194 intends to commit a crime, he engages in conduct which provides such person with means or opportunity for the commission thereof and which in fact aids such person to commit a felony” (Penal Law § 115.00). The evidence amply demonstrates that defendants intended that Cardebat and the others engage in conduct that would provide defendants with the means to commit the felony of grand larceny, as the theft of Mahboubian’s collection was a necessary step in their scheme. Thus, the conduct intended by defendants was the crime of facilitation, and it took place within the premises their accomplices had entered illegally. Moreover, since it is not necessary that the intended crime be completed to sustain a burglary conviction (People v Mackey, supra at 279), it is of no moment that the ultimate grand larceny never took place, although that would be a requirement for the completed crime of facilitation.
Accordingly, as to each defendant the Appellate Division order should be reversed and a new trial ordered in accordance with this opinion. In view of this disposition, it is unnecessary for us to consider defendants’ remaining contentions.

. Defendant Sakhai’s claim that many of these witnesses — in particular the art experts — would have been unnecessary at his separate trial is unpersuasive. In order to prove Sakhai’s guilt of the conspiracy and the substantive attempt to commit a larceny of the insurance proceeds, it was plainly important if not essential for the People to present evidence of both conspirators’ motives.

. The dissent is entirely correct when it notes that defendants’ acts had not set in motion a chain of events that would "inevitably” have led to their fraudulent acquisition of the insurance proceeds (dissenting opn, at 199). Although the defendants most surely had set a chain of events in motion, only the final act — according to the dissent, avoidance of detection — would have "inevitably” led to consummation of the crime if defendants were not interrupted. It is settled beyond peradventure, however, that the law does not require that the defendant’s act be the final step in order for conduct to constitute a punishable attempt.

. Defendant Sakhai’s claim that the statute is unconstitutional to the extent that the People are not required specifically to allege what crime is intended is without merit (see, People v Mackey, 49 NY2d 274).

. Given that the People need not allege or prove any crime in particular, the jury is ordinarily entitled to infer the defendants’ intent to commit some crime from the circumstances of the break-in (People v Gilligan, 42 NY2d 969). Here, however, as part of their case with respect to the attempted larceny charge, the People presented evidence that showed what the purpose of the entry was, and the question is whether that purpose satisfies the statutory requirement of intent to commit a crime therein.