*811 OPINION OF THE COURT
Caesar Cirigliano, J.
The defendants, Carlo Franco and Edward Sanchez, were placed under arrest on May 27, 2004. On June 4, 2004, the grand jury indicted and charged the defendants with murder in the second degree (Penal Law § 125.25 [3]), robbery in the first degree (Penal Law § 160.15 [2]), and criminal possession of a weapon in the second degree (Penal Law § 265.03). On June 14, 2004, the People gave notice to the defendants pursuant to CPL 710.30 of the intent to offer evidence of statements made by the defendants to Detective Joseph Mazzei and Assistant District Attorney (ADA) Rahman, and evidence of statements and identification procedures made by other individuals[1] (see notice and voluntary disclosure form). On January 10, 2008, this matter was assigned to this court for the purpose of conducting a Huntley /Dunaway hearing as to both defendants and a Wade hearing as to defendant Edward Sanchez only. The hearing on this matter was concluded on January 22, 2008. As part of the hearing, the defendants sought to preclude their statements and the defendants’ identification of themselves and each other made to ADA Rahman after viewing the surveillance tape. Moreover, defendants also moved for severance.
I find Detectives Joseph Mazzei, Brendan Mallon, Joseph Sikorski and Mr. Tarek Rahman to be credible witnesses and I credit their testimony. As to the testimony of Ms. Carmen Orta, I find that, due to the relationship between her and defendant Edward Sanchez, she is an interested witness and thus cannot credit her testimony.
Facts
On March 21, 2003 in the vicinity of 1460 East 222nd Street in Bronx County at or about 6:20 a.m., Mr. Dean DiSimone was robbed and shot to death by unknown assailants. The immediate respondents to the scene included Detective Gene Godwin (since retired), Detective Brendan Mallon and Detective Joseph Mazzei. At the scene of the crime, the detectives discovered the existence of a surveillance tape which captured the images of the assailants. Thereafter, using the surveillance tape as the primary source, sketches were made of the perpetrators for distribution in the form of wanted posters which eventually appeared-on the nationally televised show “America’s Most *812 Wanted.” Four to six months after the event, Detective Joseph Mazzei became the lead investigator in the case and, as part of his continuous investigation, pursued several leads, anonymous phone calls and tips that regularly came into the precinct. However, none of the leads resulted in any arrest.
Nearly a year later in March of 2004, Detective Mazzei interviewed an individual by the name of Mr. Fernandez. Mr. Fernandez informed Mazzei that he had a conversation with his friend Edward Sanchez, who stated that he and “Cano” had shot an Italian guy in the Bronx and that they had taken a computer from him (transcript at 17, lines 16-20). Moreover, he and “Cano” had received a phone call from a tow truck driver who had given them the go ahead to enter the premises. Also, an individual by the name of Chewy was mentioned during this conversation (transcript at 18, lines 18-25). Mr. Fernandez indicated that he knew “Cano” from the neighborhood and provided his real name and the vicinity in which he lived— Wales Avenue. Upon learning of the name, Mazzei ran the name into the precinct’s PIMS system computer and retrieved a photograph of one Carlo Franco. On March 27, 2004, Mazzei then arranged a photo array of approximately 8 to 10 arrest photographs which included the photo of “Cano,” also known as Carlo Franco (People’s exhibit 1) and handed the photos to Mr. Fernandez, who then picked out one photograph of Carlo Franco. Thereafter, Mazzei showed Mr. Fernandez an additional photo of Carlo Franco, which was also identified as the individual known as “Cano.”
In or about the first or second week of April, Detective Mallon, who was assisting Mazzei in this investigation, had an opportunity to interview one Joel Rosado. In essence, Mr. Rosado stated that he had a conversation with a fellow he knows only as “Cano,” who was bragging about how he was involved in a homicide. Mr. Rosado related how “Cano” told him that he went to rob a guy because he heard that he had a lot of money and, when he entered the location with another, the guy resisted and the guy got shot, and that they did not get any proceeds from the robbery except a computer (transcript at 198, lines 9-14). During this interview in April, Mr. Rosado was shown the same photo array that was shown to Mr. Fernandez and he also selected the photo of defendant Carlo Franco.
On May 27, 2004, Mazzei picked up Mr. Franco, who on that day had an appointment with his parole officer, and asked him whether he would come back to the 47th Detective Squad to
*813 answer some questions. Mr. Franco voluntarily assented to accompany Mazzei to the precinct. No handcuffs were placed upon Mr. Franco at this point. Later, at an interview room at the precinct, Mr. Franco was properly Mirandized and then asked about his possible involvement in the shooting at Bronx County Collision. According to Detective Mazzei, Mr. Franco initially denied any involvement but shortly thereafter admitted to his involvement in the incident. Mazzei related that defendant Franco stated that he and his friend Edward and another individual by the name of Maynard had gone up to the auto body shop that morning in an attempt to rob the owner of the payroll (transcript at 33, lines 15-18). A full nonverbatim statement was taken by Mazzei and then signed by defendant Franco, Mazzei and Detective Mallon. In addition to the written statement, defendant Franco was shown the surveillance tape of the crime and he identified himself, codefendant Sanchez and described his actions in the tape. Mr. Franco also disclosed that codefendant Edward Sanchez had the gun which was used to shoot at the victim and attempted to aid the detectives in identifying Mr. Sanchez. Defendant Franco informed the detectives that Mr. Sanchez had been the victim of a stabbing and provided the proximate location and the precinct in which that crime happened (transcript at 39, lines 8-11). Mr. Franco also provided Mr. Sanchez’ approximate age and the vicinity of where Mr. Sanchez lived which was in the vicinity of the 40th precinct. During this interview, no promises or threats were made to Mr. Franco.
After receiving this information, Detective Mazzei contacted the 40th precinct and requested the case file regarding Mr. Sanchez’ stabbing. Upon receiving the file, Mazzei showed the photos (three) located therein to Mr. Franco. Mr. Franco identified one of the photos as Edward Sanchez, the individual he was with at 1460 East 222nd Street, the scene of the crime. On May 27, 2004, Detective Mazzei obtained an address for Mr. Sanchez, 627 Wales Avenue in Bronx County, and asked Detective Sikorski to go pick up Mr. Sanchez. At this point, Sikorski did not have a photograph of Mr. Sanchez, but only the address and the instruction to bring him to the precinct to answer some questions. Sikorski arrived at 627 Wales Avenue with two other detectives and encountered a large group of people gathered in the street. They asked for Edward Sanchez, who then identified himself. Sikorski then asked Mr. Sanchez to accompany them to the precinct to answer some questions. At first, Mr. Sanchez *814 refused, but, shortly thereafter, he willingly accompanied the detectives to the precinct. No handcuffs were placed upon Mr. Sanchez at this point.
Later, at the 47th precinct on May 27th at or about 10:35 p.m., Mr. Sanchez was interviewed by Mazzei. Mazzei read Mr. Sanchez his Miranda rights and the same acknowledged that he understood them. Initially, Mr. Sanchez denied any involvement in the crime at Bronx County Collision. However, Mr. Sanchez ended up describing in detail his involvement in the crime and Mr. Franco’s involvement, who he referred to as “Skippy” (transcript at 61, lines 2-13). His statements were memorialized by Mazzei in writing (People’s exhibit No. 10) which was then signed by Mr. Sanchez, Mazzei and Mallon. After the written statement, Mr. Sanchez was shown the surveillance videotape and he identified himself and Mr. Franco as the individuals entering the auto shop. Moreover, Mr. Sanchez attempted to show in the surveillance videotape that at some point he passed the weapon to Mr. Franco, but was unable to pinpoint the exact moment. During this interview, no promises or threats were made to Mr. Sanchez.
On the early morning of May 28, 2004, Tarek Rahman, Esq., then an Assistant District Attorney for Bronx County, arrived at the 47th precinct and spoke to Mazzei and Mallon, who provided him with a general idea of what the case was about. At this point, the defendants were placed in separate rooms and Mr. Rahman took a videotape statement of Mr. Franco and then of Mr. Sanchez. After concluding the videotape statements, ADA Rahman immediately proceeded to view the surveillance videotape in the lunch room of the 47th precinct. After the viewing, Mr. Franco was brought in and was shown the tape and was asked to point himself out and to point Mr. Sanchez out, which he did. Mr. Franco, at that point, identified himself as the one wearing a wool knit cap and Mr. Sanchez as wearing a hood. No further questions were asked. After Mr. Franco was removed from the room, Mr. Sanchez was brought in to also view the surveillance videotape. Mr. Sanchez identified himself and then identified Mr. Franco, but, unlike Mr. Franco, Mr. Sanchez informed ADA Rahman that at some point he had passed the gun to Mr. Franco. He was then asked to point to the moment he passed the gun, but was unable to.
Discussion and Conclusions
The court finds that the noticed identification procedures undertaken on March 27, 2004 with Mr. Fernandez and/or in April *815 2004 with Mr. Rosado were confirmatory in nature due to the relationships between Mr. Rosado, Mr. Fernandez, Mr. Franco and Mr. Sanchez. Further, the single photograph of Mr. Sanchez shown to Mr. Franco was also confirmatory in nature due to their close relationship. (See People v Rodriguez, 79 NY2d 445, 449 [1992].)
Moreover, the court finds that, due to the information supplied by Mr. Rosado and Mr. Fernandez, who were familiar with and knew Mr. Franco for years, the police had probable cause to pick up Mr. Franco and, following the interview with Mr. Franco, the police also had probable cause to bring in Mr. Sanchez for questioning.
The court finds that both defendants voluntarily accompanied the detectives to the 47th precinct, that they were both properly Mirandized, and that they were made no promises. Additionally, it is this court’s conclusion that the prosecution has sustained its burden of proof that defendants’ written and videotaped statements were voluntarily made.
A. Application of CPL 710.30 to Self-Identification by the Defendants
The self-identification by defendants in the surveillance tape is a novel issue, which presents dual questions because the act of the self-identification and the identification of each other is both an identification procedure and an admission.
The relevant part of CPL 710.30 states that:
“1. Whenever the people intend to offer at a trial ...(b) testimony regarding an observation of the defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the case, to be given by a witness who has previously identified him as such, they must serve upon the defendant a notice of such intention, specifying the evidence intended to be offered.” (Emphasis added.)
CPL 710.30 underscores and facilitates the defendant’s right, prior to trial, to test the reliability of any out-of-court identifications by witnesses whom the People intend to call at trial. The statutory scheme ensures that the identifications are not the product of undue suggestiveness, and lessens the possibility of misidentification. (People v Boyer, 6 NY3d 427 [2006], citing People v Rodriguez, supra; People v Newball, 76 NY2d 587, 590-591 [1990].)
This court finds that CPL 710.30 does not apply to the identification procedure that took place when the defendants *816 viewed and identified themselves and each other in the surveillance tape. CPL 710.30 notice is not required when the parties are known to each other and the identification is merely confirmatory (People v Rodriguez, supra). Further, the defendants are not witnesses whom the prosecution intends to call.
B, Self-Identification in Surveillance Tape as Admissions
Now, in this case, the defense argued that the admissions pertaining to the surveillance tape and Mr. Rahman’s testimony must be precluded because they did not have proper notice pursuant to CPL 710.30. On the other hand, the People argue that proper notice was given for the statements, to wit, the defendants’ identification of themselves and each other and any statements made in connection with that tape were all part of a continuous interrogation which was properly noticed pursuant to CPL 710.30.
It is this court’s opinion that the self-identification by defendants and the identification of each other in the surveillance tape are admissions and thus subject to the CPL 710.30 notice requirement. Moreover, the court finds that the statements were properly noticed and were knowingly and voluntarily given after the defendants waived their Miranda rights. (People v Springer, 221 AD2d 386 [1995].)
Here, the prosecution’s CPL 710.30 notice included language which clearly advised the defense of the existence of a surveillance tape and the prosecution’s intent to use the statements made by each defendant as they viewed the tape:
“PLEASE TAKE NOTICE, pursuant to section 710.30 of the Criminal procedure law, that during the trial of the indictment herein the People intend to offer evidence of a statement(s) made by the defendant, CARLO FRANCO, to a public Servant, DETECTIVE MAZZEI, on 5/27104 at approximately 1:30 p.m. at 47 SQUAD OFFICE, the substance of which was ADMITS TO GOING TO THE LOCATION WITH THE CO-DEFENDANT . . . WITH A LOADED FIREARM TO ROB THE DECEASED. SAYS CO-DEFENDANT DID THE SHOOTING AND THEY RAN OUT WITH THE DECEASED’S BAG. (SEE ATTACHED) FRANCO WATCHED THE SURVEILLANCE VIDEO AND POINTED TO HIMSELF (NOT IN WRITING). HE IDED DEFENDANT SANCHEZ . . .
*817 “PLEASE TAKE NOTICE, pursuant to section 710.30 of the Criminal Procedure Law, that during the trial of the indictment herein the People intend to offer evidence of a statement(s) made by the defendant EDWARD SANCHEZ, to a public servant, DETECTIVE MAZZEI, on 5/27/04 at approximately 22:35 hrs., at 47th SQUAD OFFICE, the substance of which was FIRST DENIES[,] THEN ADMITS TO GOING IN TO ROB THE PLACE WITH A LOADED GUN AND CO-DEFENDANT SKIPPY. ADMITS HAVING THE LOADED GUN, WALKING IN WITH IT, THEN PASSING IT TO CO-DEFENDANT. (SEE ATTACHED), IDENTIFIES HIMSELF IN SURVEILLANCE VIDEO (NOT IN WRITING) . ~
“PLEASE TAKE NOTICE, pursuant to section 710.30 of the Criminal Procedure Law, that during trial of the indictment herein the People intend to offer evidence of a statement(s) made by the defendant, CARLO FRANCO, to a public servant, ASSISTANT DISTRICT ATTORNEY RAHMAN, on 5/28/04 at approximately 2:00 a.m. at 47th SQUAD OFFICE, the substance of which was ADMISSION TO CRIME WITH CO-DEFENDANT . . .
“PLEASE TAKE NOTICE pursuant to section 710.30 of the Criminal Procedure Law, that during trial of the indictment herein the People intend to offer evidence of a statement(s) made by the defendant, EDWARD SANCHEZ, to a public servant, ASSISTANT DISTRICT ATTORNEY RAHMAN, on 5/28/04 at approximately 2:30 a.m. at 47th PDU, the substance of which was ADMITS TO PARTICIPATION IN ROBBERY, which statement was Videotaped, and is available for inspection.”
In the instant case, the court is in agreement with the People’s argument in that the videotaped statements and identification of themselves and each other in the surveillance tape by the defendants to ADA Rahman was a continuation of interrogations for which proper notice was given.
Further, the CPL 710.30 notice given herein contained “the sum and substance” of the particular evidence to be submitted, thus complying with the requirements of the statute. In People v Mikel (303 AD2d 1031 [2003]), the Appellate Division, Fourth Department, refused to suppress a map drawn by the defendant of the crime scenes involved, concluding that the People’s CPL *818 710.30 notice was sufficient to apprise the defendant that they would be introducing the particular evidence (i.e., the map) because the CPL 710.30 notice contained “the sum and substance” of what the particular evidence indicated (see also People v Morris, 248 AD2d 169 [1998]; People v Figueras, 199 AD2d 409 [1993]).
Motion for Severance
The final issue before the court is defendants’ motion for severance. In this case, both defendants have made oral, written and videotaped statements in which they relate their version of the events which occurred on the morning of March 21, 2003. Both of their statements contain numerous references to the codefendant’s participation in the crime making it virtually impossible to redact the statements made by each.
Moreover, the major distinction between their two statements is who possessed the gun used to fire the deadly shot that killed Mr. Dean DiSimone. It is well-established law that
“where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial[,] [n]ot only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others,” and thus severance is mandated. (Bruton v United States, 391 US 123, 135-136 [1968].)
Our Court of Appeals in People v Cruz (66 NY2d 61, 73 [1985] )[2] recognized that “severance is not required solely because of hostility between the defendants, differences in their trial strategies or inconsistencies in their defenses”; however, severance is compelled where the core of each defense is in irreconcilable conflict with the other and where there is a significant danger, as both defenses are portrayed that the conflict alone would lead a jury to infer defendants’ guilt. (People v Mahboubian, 74 NY2d 174 [1989].) Thus, because the statements of both defendants are prejudicial to the codefendant, severance is mandated.

. Statements and identification procedure made by Mr. Fernandez to Detective Mazzei and by Mr. Joel Rosado to Detective Mallon.

. People v Cruz was reversed and remanded on other grounds by the Supreme Court of the United States in Cruz v New York (481 US 186 [1987]).