10-2792-cr
*United States v. Celaj*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2010

(Argued: May 18, 2011                              Decided: August 22, 2011)

Docket No. 10-2792-cr

---

UNITED STATES,

    *Appellee*,

    – v. –

DIN CELAJ,

    *Defendant-Appellant.*

---

Before: MINER, CABRANES, AND STRAUB, *Circuit Judges*.

Appeal from a judgment entered July 7, 2010, in the United States District Court for the Southern District of New York (Patterson, J.), convicting defendant-appellant, after a jury trial, of, inter alia, Hobbs Act violations predicated on robbery, and sentencing defendant principally to an aggregate term of 601 months' imprisonment, where the defendant-appellant challenges Hobbs Act jurisdiction after stipulating that "marijuana is grown outside of the state of New York and travels in interstate and foreign commerce to arrive in the New York City area" and also challenges the District Court's denial of his Rule 29(a) motion for a judgment of acquittal as to one of his Hobbs Act attempted robbery counts.

Affirmed.

            WILLIAM O. SCHARF, Harvard Law School, Cambridge, Massachusetts, for Defendant-Appellant.[*]

            Marc L. Greenwald and Jake M. Shields, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York , for Defendant-Appellant.

            JOHN T. ZACH, Assistant United States Attorney (Arlo Devlin-Brown and Andrew L. Fish, Assistant United States Attorneys, of counsel),  for Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, for Appellee.

---

[*] Law Student Admitted Pursuant to Local Rule 46(e).

MINER, Circuit Judge:

Defendant-appellant Din Celaj appeals from a judgment of conviction entered July 7, 2010, following a jury trial, in the United States District Court for the Southern District of New York (Patterson, J.), convicting him of eleven counts of a thirteen-count Indictment, including several Hobbs Act violations predicated on robbery and conspiracy to commit robbery, and sentencing him principally to a 601-month term of imprisonment. The government did not present any witnesses as to the required interstate jurisdictional element under the Hobbs Act, but the parties entered into a stipulation that "marijuana is grown outside of the state of New York and travels in interstate and foreign commerce to arrive in the New York City area." After the close of evidence, Celaj made a Rule 29(a) motion for a judgment of acquittal, which the District Court denied, finding that there was sufficient evidence to sustain a conviction. Celaj now challenges the sufficiency of the evidence to support his conviction on the Hobbs Act counts and associated weapons charges. The government contends on appeal that the stipulation is sufficient to support the required jurisdictional element under the Hobbs Act. Celaj also argues that the District Court erred in denying his Rule 29(a) motion as to one of his Hobbs Act attempted robbery convictions. We affirm for the reasons set forth below.

## BACKGROUND

I.      Underlying Criminal Activity[1]

Beginning at least in 2007, Celaj headed a New York City criminal gang that engaged in car thefts, drug dealing, and armed robberies. Celaj's "crew" of associates included Jason Montello, Moheed Oasman, Ali Zherka, Rabindra Singh, Robert Melville, and Darren Moonan, a former New York Police Department ("NYPD") police officer.

---

[1] Our recitation of the facts relies essentially on the trial testimony that the jury reasonably could have credited in reaching the verdict that it rendered and, as recounted here, is not contested on appeal. See United States v. Arena, 180 F.3d 380, 391 (2d Cir. 1999) (holding that on sufficiency-of-the-evidence challenges, we "view the evidence in the light most favorable to the government") (internal quotation marks omitted).

Between January and July 2007, Celaj, Singh, and Zherka together stole over 20 high-end vehicles. After he stole a vehicle, Celaj would take it to a scrap processing center in the Bronx where he would sell it to the yard manager who was, in fact, an undercover NYPD officer. In total, Celaj brought 23 stolen cars to the undercover officer between January and July 2007. Celaj often told the undercover officer that he "was in the business of dealing in late model vehicles" and, on one occasion, broke into three separate Lexus vehicles in front of the officer to demonstrate his abilities.

In addition to discussing stolen vehicles, Celaj told the undercover officer about his other criminal activities, including selling marijuana. He told the officer that he obtained his supply "from Florida or from Michigan through contacts in Canada." He also described to the officer how he stole marijuana from drug dealers. Celaj said that he would rob marijuana from drug dealers by impersonating an agent from the Drug Enforcement Administration (the "DEA") and "knock[ing] down [the] doors" of those drug dealers.

In one recorded conversation on June 14, 2007, Celaj told the undercover officer, "I get weed once a month — in like any quantity." Celaj continued, "but see the thing is this, I'm not buying it, I'm stealing it. So . . . there could be fuckin' Arizona or it could be haze. You never know." Celaj went on to say that he had gotten 248 pounds of marijuana by "kicking the fuckin' doors in and that's it." Celaj also explained that the robbery crew posed as law enforcement officers, saying, "we walk in there DEA nobody mo[ve]—." One such robbery and two such attempted robberies are the subject of this appeal. The facts giving rise to these robberies are as follows.

In April 2007, Celaj and his crew — Moonan, Montello, Melville, and Celaj's brother, Jerry Celaj — planned to rob a Bronx drug dealer named "George." Prior to setting out on the robbery, Celaj informed Melville that George was a drug dealer whom he had robbed before. The crew then drove to George's home in the Bronx. When they arrived, Moonan and Celaj, both of whom had firearms and wore police shields around their necks, approached the door to the home with Melville accompanying them. Jerry Celaj stayed behind in the car. Celaj then knocked on George's door, and eventually a man (who was apparently George's brother) answered. At that point, Celaj

announced that he was a police officer, brandished his gun, pointed it at the man who answered the door, and told him to subdue a dog that was barking from within the home. Celaj, Moonan, and Melville then entered the home.

Once inside, Celaj and Moonan took George's brother to the living room and forced him to sit on the floor. Meanwhile, Melville proceeded to a room identified as George's room and began searching for drugs, money, and guns. Melville located approximately one pound of marijuana, some cash, and a firearm. Melville gave the money to Celaj and kept the marijuana and gun for himself. Celaj and the crew then went to a warehouse that Celaj believed to be a "stash house" where George and his associates stored marijuana for their drug dealing business. At the warehouse, Celaj used a screwdriver to break into the building. After entering, Celaj and his crew found a room containing approximately 100–150 pounds of marijuana and $300–400 in single dollar bills. They took the marijuana to Melville's home in Queens. Over the course of the following weeks, the crew sold the marijuana in the New York City area.

Following the robbery of George's home (and the theft from the warehouse), Celaj and his crew continued to search for other drug dealers to rob. After a series of failed attempts to find a viable target, Montello proposed robbing a drug dealer named Bobby Brown who lived on Long Island. Montello had learned from an individual named "Mike" that Brown was a drug dealer.[1] Montello previously had passed by Brown's home with an eye towards robbing it, but he was unable, for a variety of reasons, to find an opportunity to carry out the robbery. With Celaj, Montello guided the crew — including Moonan, Melville, and "Ro," an associate of Montello's — to Brown's home. Celaj and Moonan approached the house with guns in their waistbands and police shields around their necks. Melville joined them on the way up to the door, "dressed as [an] undercover police officer[ ]." Montello stayed behind in the car, and Ro parked the car "several blocks away" to act as an additional look-out. After reaching the house, Celaj knocked on the door, while both he

---

[1] The government did not call "Mike" to testify at trial, and Celaj did not object to Montello's testimony regarding information allegedly provided to him by "Mike."

and Moonan drew their guns and yelled that they were the "police." Eventually, Brown opened the door and began asking, "[w]hat did I do wrong, Officer?" Celaj and Moonan then forced Brown down on the floor at gunpoint to check for weapons. Almost immediately thereafter, an alarm went off in Brown's home. The alarm startled Celaj, Moonan, and Melville, and they quickly ran from Brown's home out of concern that actual police officers would soon arrive. They then fled the scene in Montello's car and did not return.

The next day, the same crew (except for Ro) drove to Sayville, on Long Island, to a house that they had "looked at the night before." Montello identified Eric Knierim, who lived in Sayville, as a robbery target. Montello had learned from a woman called "MJ," Knierim's girlfriend, that Knierim owned a big glass company, from which he had cash-on-hand, and that he also sold marijuana and cocaine. MJ apparently informed Montello that money and drugs were hidden in a safe in Knierim's home.[2] Because the narcotics and cash were locked in the safe, the crew agreed that Knierim would need to be home to open the safe. The crew then drove together to the site of the proposed robbery.

After they arrived at Knierim's home, Celaj, Moonan, and Montello approached the home together, and Melville stayed behind in the car. Celaj and Moonan had guns and police shields, and all three (including Montello) were dressed as undercover police officers. When they got to the door, they knocked and announced themselves as the "police." Knierim, however, did not answer the door because he was not at home. Instead, his cleaning lady Karen Hans unexpectedly came to the door. She offered to call Knierim so that he could return to the house. However, since Hans was at the house and Knierim was not, Celaj, Moonan, and Montello decided that their plan would not work, and they left the premises.

Celaj was later arrested on July 8, 2007, and remanded to custody.

---

[2] The government did not call MJ to testify at trial, and Celaj did not object to Montello's testimony regarding information allegedly provided to him by MJ.

II.    Proceedings in the District Court

Celaj was indicted on August 24, 2009, by a Grand Jury impaneled in the Southern District of New York, on thirteen counts including: one count of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951; two counts of Hobbs Act attempted robbery, in violation of 18 U.S.C. §§ 1951–2; two counts of Hobbs Act robbery, in violation of 18 U.S.C. §§ 1951–2; four counts of brandishing or unlawfully possessing a firearm in relation to a crime of violence, in violation of various subsections of 18 U.S.C. § 924(c); one count of conspiracy to distribute and to possess with intent to distribute 50 kilograms or more of marijuana, in violation of 21 U.S.C. § 846; one count of conspiracy to transport and to sell motor vehicles, in violation of 18 U.S.C. § 371; one count of transporting stolen vehicles, in violation of 18 U.S.C. §§ 2312 and 3; and one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1341.

The case proceeded to a nine-day jury trial in September–October 2009. The government's evidence included court-authorized wire interceptions of Celaj and others, various recorded conversations between Celaj and the aforementioned undercover officer, and the testimony of four witnesses — the undercover officer, Melville, Montello, and Moonan. Celaj did not testify and did not call any witnesses on his behalf. After the government had presented its case, the parties submitted a stipulation that stated: "It is hereby stipulated and agreed . . . that marijuana is grown outside of the state of New York and travels in interstate and foreign commerce to arrive in the New York City area." According to the government, it entered into the stipulation in lieu of calling a DEA agent as an expert witness to testify about the interstate nature of the marijuana trade. Celaj thereafter moved pursuant to Federal Rule of Criminal Procedure 29(a) to dismiss the indictment, including all the Hobbs Act and 924(c) counts. The District Court denied the motion from the bench.

After both parties had rested, the District Court instructed the jury, inter alia, as to the Hobbs Act requirement that a robbery affect or potentially affect "in some way commerce within

-6-

one state that goes through any place outside that state." In relevant part, the court instructed the jury that:

> it is not necessary for you to find that the defendant intended or anticipated that the effect of his acts would be to affect commerce or that he had a purpose to affect commerce. All that is necessary is that the natural effect of the acts committed in furtherance of the crime charged in each count would in any way have affected commerce.
>
> Thus . . . if you find beyond a reasonable doubt that the defendant believed that the robbery victim possessed narcotics to be distributed or the proceeds derived from the sale of narcotics, you must determine whether the effect of the defendant's actions was or would be to actually or potentially affect commerce in narcotics in any way or degree, whether that effect was harmless or not.

The jury began its deliberation on October 1, 2009. The following day, it returned a verdict of guilty on all counts except Counts Eight and Nine (a robbery and associated firearms charge not at issue on appeal).

Prior to sentencing, the United States Probation Office prepared a Presentence Investigation Report (the "PSR"). In that report, the Probation Office noted that Celaj began his career as a criminal at the age of 12 when he was convicted for attempted grand larceny in connection with attempted extortion of his victim. From that point forward, Celaj engaged in a variety of crimes, including home invasion robberies, drug dealing, and firearms trafficking. The PSR further noted that Celaj became involved in the instant offenses less than two years after his release from prison on prior unrelated charges. After considering these factors, the District Court sentenced Celaj to an aggregate term of 601 months' imprisonment. Thereafter, judgment was entered, and on July 13, 2010, Celaj filed a timely notice of appeal.

On appeal, Celaj contends principally that the admissible evidence, including the stipulation regarding the interstate nature of marijuana, was not sufficient to support the jurisdictional element required under the Hobbs Act. Celaj also argues that his conviction as to the attempted robbery of Eric Knierim cannot be sustained because Knierim was not present at his home when Celaj attempted to rob him. This argument is based on the contention that Congress, in enacting the Hobbs Act, adopted the New York Court of Appeals' decision in People v. Rizzo, 246 N.Y. 334

(1927), which was not to allow a Hobbs Act conviction in such circumstances. Thus as to this conviction for the Hobbs Act attempted robbery of Knierim, Celaj contends that the District Court erred by denying his Rule 29(a) motion.

**ANALYSIS**

I.      Standard of Review

We review de novo a claim of insufficient evidence and a denial by a district court of a Federal Rule of Criminal Procedure 29(a) motion, applying the same standards as the District Court. See, e.g., United States v. Yannotti, 541 F.3d 112, 120–21 (2d Cir. 2008). "[W]e must credit every inference that could have been drawn in the government's favor, and we must view the evidence as a whole." United States v. Applins, 637 F.3d 59, 76 (2d Cir. 2011). A conviction must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). A verdict may be based entirely on circumstantial evidence. United States v. D'Amato, 39 F.3d 1249, 1256 (2d Cir. 1994). In assessing the sufficiency of the evidence, a reviewing court must consider all of the evidence admitted at trial, whether or not the evidence was properly admitted. United States v. Hardwick, 523 F.3d 94, 101 (2d Cir. 2008).

II.     Hobbs Act

A.      Relevant Law

The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do" has committed a crime. 18 U.S.C. § 1951(a) (2006). In a Hobbs Act prosecution, "[p]roving an effect on interstate commerce is . . . an element of a Hobbs Act offense, which must be proven beyond a reasonable doubt to a jury." United States v. Parkes, 497 F.3d 220, 227 (2d Cir. 2007). However, "it is well established that the burden of proving a nexus to interstate commerce is minimal." United States v. Elias, 285 F.3d 183, 188 (2d Cir. 2002); see also Parkes, 497 F.3d at 230 ("[T]he required showing of an effect on interstate commerce is de minimis."). In fact,

"if the defendant[']s conduct produces any interference with or effect upon interstate commerce, whether slight, subtle, or even potential, it is sufficient to uphold a prosecution under the Hobbs Act." United States v. Perrotta, 313 F.3d 33, 36 (2d Cir. 2002) (internal quotation marks and alterations omitted). Moreover, "[t]he required evidence of an effect need not take any particular form or be offered in any particular quantum — direct, indirect, or circumstantial evidence could suffice. It is a case-by-case inquiry." Parkes, 497 F.3d at 231 n.11.

As to the jurisdictional element in a Hobbs Act prosecution for robbery of narcotics, a jury may assume that cocaine and heroin travel in interstate commerce because those drugs cannot be grown, processed, and sold entirely within the state of New York. United States v. Needham, 604 F.3d 673, 680 (2d Cir. 2010). However, because marijuana can be "grown, processed, and sold" entirely within New York, a jury cannot assume an interstate nexus simply based on the presence of marijuana alone. Id. at 681. Rather, "the jury [must] determine, beyond a reasonable doubt, whether the [defendant's] conduct affected, or would have affected, interstate commerce." Parkes, 497 F.3d at 230.

B.    Celaj's Challenge

Celaj challenges the sufficiency of the evidence upon which he was convicted, arguing that the stipulation at issue was insufficient to establish the requisite jurisdictional element.[3] In his view, the stipulation "established [only] the uncontroversial point that, as a general matter, marijuana travels in interstate commerce" and, as such, it failed to provide "particularized evidence that the alleged Hobbs Act crimes affected interstate commerce" in this case. In determining that the stipulation provided sufficient evidence that Celaj's conduct had, at a minimum, a de minimis effect on interstate commerce, we review some of our precedent in which we have examined the effect of a Hobbs Act drug robbery on interstate commerce.

---

[3] Celaj also contends that there was no admissible evidence at trial that narcotics actually were present during the attempted robberies, arguing that the only evidence on this issue was in the form of "inadmissible hearsay" from out-of-court declarants "Mike" and "MJ." The actual presence of marijuana need not be shown to convict for these Hobbs Act violations, and there was sufficient evidence of Celaj's intent to rob drug dealers to fulfill the requirements for the convictions.

In Parkes, the defendant was convicted on multiple counts, including Hobbs Act attempted robbery, "arising out of his participation in a botched robbery targeting drugs and drug proceeds." 497 F.3d at 223. After proceeding to a jury trial, a properly-instructed jury convicted the defendant on the Hobbs Act attempted robbery count based on evidence that included (1) testimony that a "small but going" marijuana enterprise was the intended object of the robbery; (2) "one large bag containing marijuana, 58 smaller 'nickel bags,' and $4,000 in cash"; and (3) testimony of an experienced narcotics investigator that "marijuana is almost exclusively trucked into the United States, predominantly through Mexico and that very little marijuana is grown in New York." Id. at 231 (alterations and internal quotation marks omitted). We sustained the defendant's conviction, holding that based on the "limited evidence adduced at Parkes's trial, . . . a reasonable juror, hearing [the foregoing] evidence, could have found that the attempted robbery of [the robbery target's] marijuana or proceeds would have affected interstate commerce 'in any way or degree.'" Id. (quoting 18 U.S.C. § 1951(a) (footnotes omitted)).

In Needham, the defendant participated in "a series of violent robberies targeting narcotics dealers in the New York City area" and thereafter was charged with, inter alia, Hobbs Act attempted robbery and robbery. 604 F.3d at 676. At trial, the jury was improperly instructed (but consistent with the law of this Circuit at that time) that all drug trafficking activity has an effect on interstate commerce. Id. at 678 (noting that the law "has since changed" and that "[p]roof of drug trafficking is no longer regarded as automatically affecting interstate commerce"). The defendant was then convicted on the robbery counts. In reviewing for whether the error in the jury instruction affected the defendant's substantial rights, we determined that the evidence offered by the government at trial did not meet the "modest threshold" of proving a connection to interstate commerce. As to that required jurisdictional element, we explained:

> Apart from the simple amount of money obtained [i.e. approximately $600,000], the government offered no evidence to support an interstate nexus for the completed robberies. It presented no proof that the marijuana sold by the victims had originated out of state, that it was sold to out-of-state customers, that the victims themselves crossed state lines in conducting their business, or that the robbery depleted assets that would have purchased goods in interstate commerce.

Id. at 681. We further noted that the government did not offer any testimony about the production and trafficking of marijuana in New York. Id.

Guided by Parkes and Needham, we now conclude that the evidence proffered by the government in this case achieves the same effect as the evidence offered in Parkes, in which case the evidence was sufficient to sustain the interstate element of the Hobbs Act attempted robbery count at issue. The key evidence in Parkes was the narcotics investigator's testimony that "marijuana is almost exclusively trucked into the United States, predominantly through Mexico and that very little marijuana is grown in New York." 497 F.3d at 231. In this case, the stipulation entered into by the parties — that "marijuana is grown outside of the state of New York and travels in interstate and foreign commerce to arrive in the New York City area" — conveys the same information about the interstate nature of the marijuana trade. Moreover, unlike Needham, where the sole evidence offered as to the jurisdictional element was drug money, here, the government offered not only the stipulation but also Celaj's statement to the undercover police officer that he was in the business of stealing marijuana and his concession at trial that he had been a marijuana dealer. Together, this evidence permitted the jury reasonably to conclude that Celaj's criminal actions had a nexus with interstate commerce.[4]

III.  The *Rizzo* Rule

Celaj argues that his Hobbs Act attempted robbery conviction as to Knierim should be vacated for the independent reason that Celaj was never in Knierim's presence, which Celaj claims is a necessary predicate to a conviction, citing People v. Rizzo, 246 N.Y. 334 (1927). Unfortunately for Celaj, he provides no federal authority in support of such a novel interpretation. Moreover, Rizzo is inapposite and not inconsistent with federal authority in any event.

---

[4] The stipulation also provides us with an independent reason to affirm Celaj's conviction — namely that Celaj waived any challenge to the sufficiency of the evidence that a robbery of a marijuana dealer would affect interstate commerce by entering into a factual stipulation that marijuana traveled in interstate and foreign commerce to arrive in New York. See, e.g., United States v. Quinones, 511 F.3d 289, 320–21 (2d Cir. 2007) (explaining the concept of "true waiver").

In Rizzo, four co-conspirators formed the intent to rob a man named Charles Rao, whom they believed was going to withdraw a substantial sum of money from a bank in New York City. 246 N.Y. at 336. The conspirators drove the streets of New York looking for Rao. However, before determining his whereabouts, the conspirators were arrested by police officers (who were apparently hot on their trail) as they approached a bank. Id. The New York Court of Appeals, in ruling that as a matter of law the men were not guilty of an attempted robbery, relied on the fact that "up to the time they were arrested" they had not "discovered [Rao]" and "were still looking for him." Id. at 336–38. Rao was not present at the bank where the men were arrested. Id. at 338. Thus, "no attempt to rob him could be made, at least until he came in sight." Id.

New York courts have cited Rizzo for the proposition that a defendant must come "very near to the accomplishment of the intended crime" for an attempt conviction to stand. See, e.g., People v. Di Stefano, 38 N.Y.2d 640, 652 (1976); People v. Mahboubian, 74 N.Y.2d 174, 190 (1989) (citing Rizzo when considering the issue of whether a defendant's conduct came "very near" or "dangerously near" the completion of a crime); People v. Naradzay, 50 A.D.3d 1489, 1490 (4th Dep't. 2008) (same). These courts have not, however, cited to Rizzo for the proposition that, as a matter of law, a defendant is not guilty of attempted robbery when he has not found the person whose property he intends to steal. Rather, the "rule" to be taken from Rizzo is the uncontroversial principle that New York law requires a defendant to come within a "dangerous proximity" of committing a crime to be guilty of attempt. See Rizzo, 246 N.Y. at 337.

New York's "dangerous proximity" requirement is virtually identical to the federal requirement that a defendant must take a "substantial step" toward the commission of a crime to be guilty of attempt. United States v. Fernandez-Antonia, 278 F.3d 150, 162–63 (2d Cir. 2002) (noting that the distinction between the federal and state requirements is "more semantic than real").[5] Under federal law, "[f]or a defendant to have taken a 'substantial step,' he must have engaged in

_____

[5] Because any difference between the New York and federal attempt requirements does not bear on our holding in this case, we need not and do not address Celaj's contention that Congress adopted Rizzo when it looked to New York criminal law to define robbery under the Hobbs Act.

more than 'mere preparation,' but may have stopped short of 'the last act necessary' for the actual commission of the substantive crime." United States v. Yousef, 327 F.3d 56, 134 (2d Cir. 2003).

Here, Celaj and his associates intended to enter Knierim's home to rob him of drugs and money hidden in his safe. The drugs and money were not believed to be on Knierim personally. Moreover, Celaj was not "hunting about the streets" looking for his intended target, "not knowing where [he] was." See Rizzo, 246 N.Y. at 338–39. Rather Celaj and his associates knew the location of Knierim's home, approached it with guns and police shields, announced themselves as the "police," and spoke with Knierim's housekeeper. Given this ample evidence, a rational juror could find that Celaj's conduct went far beyond "mere preparation" and constituted a "substantial step" toward commission of a robbery. We therefore conclude that the District Court did not err in denying Celaj's Rule 29(a) motion.

* * *

We have considered all of Celaj's other arguments and find them to be without merit.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the District Court in its entirety.