■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LARRY MOBLEY, Appellant.—Judgment, Supreme Court, New York County (Thomas Galligan, J.), rendered on or about May 18, 1987, convicting defendant, after a jury trial, of murder in the second degree (Penal Law § 125.25 [1]) and criminal possession of a weapon in the second and third degrees (Penal Law §§ 265.03, 265.02 [4]) and sentencing him to concurrent terms of 15 years to life on the murder conviction and 2 to 6 years for criminal possession of a weapon in the third degree and to a consecutive sentence of 3 to 9 years for criminal

possession of a weapon in the second degree, unanimously affirmed.

Defendant was convicted of the drug gang execution of one Harold Bates. Defendant's codefendant Ulysses Boyd is the subject of a separate appeal. Boyd was a gang leader of the Vigilantes and P.C. Crew, drug gangs operating in upper Manhattan. The defendant herein appealing was positively identified in lineups and in court by several witnesses as being a participant in the execution.

The crime occurred in the basement of a three-story private residence of a family, the son of which, against his parents' wishes, would smoke crack in the basement with his friends. Several of these friends sold drugs to support their habits. On the evening of April 27, 1986, defendant and Boyd arrived with the son. At that time several of the witnesses to the subsequent homicide were in the basement. Among them was Millicent Moore, who testified that Boyd identified himself to her as "Billy Bang" and that he claimed that he was affiliated with the Vigilantes and P.C. Crew. Boyd also told Moore that they were taking over the basement to sell crack. Moore testified that defendant identified himself as "Larry". Moore also testified that defendant Boyd bragged to her that "when a nigger got in their way, they would knock him off * * * you kill a nigger in a minute."

Joseph Sealy, another witness, testified that Boyd was, in fact, the leader of the P.C. Crew. Among other witnesses in the basement were Miguel Acosta and the victim Harold Bates. The witnesses generally testified that over the course of the night Boyd sold crack out of the basement to between 50 and 100 customers. Boyd evinced his intention of monopolizing the crack trade out of the basement.

At some time after 4:30 A.M., Acosta started cooking crack. Boyd ordered everybody out, but Acosta insisted that he wanted to finish cooking the crack. Boyd and Acosta got into an altercation. Bates had been asleep at this point. Upon waking, he got up and moved towards his friend Acosta. Defendant hit Bates repeatedly, knocking him down, and along with Boyd and a third party, pulled out guns. Defendant pulled out an Uzi, loaded it and pointed it at Acosta and Bates. After defendant finished hitting Bates, Boyd started beating Bates' head with his gun, and then with a brick, despite Bates' pleas to let him go. Boyd then said "Bust him." The third party, who was not convicted, shot Bates in the back several times as defendant trained his gun on the other

occupants of the basement. Two witnesses testified that defendant had also shot Bates, although this testimony was not borne out by ballistics evidence. Police were summoned immediately, and the defendants were apprehended in short order.

At trial, Acosta testified that three weeks after the killing, he was approached, offered money and warned not to testify. Acosta was then placed in protective custody. On November 10, 1986, Moore was shot in the head, in connection with her testifying, but survived. Moore was then placed in protective custody. Several other witnesses entered into cooperation agreements with the District Attorney and received housing and relocation.

Viewing the evidence in a light most favorable to the People *(People v Allah,* 71 NY2d 830), the evidence was legally sufficient to support defendant's conviction of intentional murder on a theory of accomplice liability *(see,* Penal Law § 20.00). It is well established that "[i]t is not necessary to prove that the defendant fired the fatal shot if the evidence is sufficient to establish that the defendant was acting in concert with another who did fire the fatal shot and that the defendant was acting with the mental culpability required for the commission of the crime" *(People v Brathwaite,* 63 NY2d 839, 842). The evidence in this case makes it clear that defendant not only participated in the beating, but by training his Uzi on any potential helpers, ensured that Boyd's order that Bates be executed would be carried out without interference. The evidence unequivocally supports the conclusion that defendant shared the mental culpability of the other killers and intentionally aided in the killing.

Applying the standard set forth in *People v Mahboubian* (74 NY2d 174), we do not conclude that the trial court abused its discretion in denying defendant's motion to sever his prosecution from that of codefendant Boyd. It is well established that only the most cogent of reasons warrant severance *(see, People v Bornholdt,* 33 NY2d 75, 87; *see,* 2 Waxner, NY Crim Prac ¶ 9.6 [Indictment]; 4 Zett, *op. cit.,* ¶ 28.3 [4] [Testimony]). We note that some 30 witnesses, almost all of whom would have given the same testimony at each trial, were scheduled to testify. Measures were taken against the lives of certain of these witnesses, and others were "reached". Granting defendant's motion to sever would have expanded a four-week trial into several such trials, with repetitive appearances of witnesses, whose identities would have been disclosed during the first trial, which would likely have undermined the security of those witnesses. Defendants themselves set in motion these

policy considerations. Defendant focuses on testimony which established Boyd's stated willingness to kill, and the attempted killing of one witness. The court gave an instruction *in limine* directing the jury to consider this evidence against only Boyd, and that it only went to the declarant's state of mind. It must be presumed that the jury followed these instructions *(People v Davis,* 58 NY2d 1102, 1104). We also note that the jury acquitted a third defendant, apparently one who fired the shots, undermining defendant's argument that joinder resulted in undue prejudice to Boyd's codefendants.

With respect to the protective order, we conclude that it was proper to prevent disclosure of the witnesses' respective names and addresses until just prior to their testimony. *(See, People v Andre W.,* 44 NY2d 179, 185-186; *People v Presto,* 131 AD2d 707.)* When witnesses are in danger of being threatened (CPL 240.50 [1]; *People v Rivera,* 119 AD2d 517), the court may exercise its sound discretion *(People v Rhodes,* 154 AD2d 279) to delay discovery of witnesses' names and addresses until trial, or even to conceal their identities during trial *(see, People v Remgifo,* 150 AD2d 736). In his offer of proof, the Assistant District Attorney presented to the court evidence of intimidation of witnesses, as well as information about the Vigilantes' assassination contracts, and a specific instance of an execution of a witness to another murder trial, by the Vigilantes, after his identity had been revealed; it is noteworthy that codefendant Boyd had been associated with that murder. It cannot be said that the trial court abused its discretion. Nor is there any infirmity in the fact that the court's hearing was in camera, from which defendant and counsel were excluded *(see, e.g., People v Andre W., supra,* at 185).

Neither do we find infirmity in the inadvertent pretrial viewing of defendants by some witnesses; the comprehensiveness of the hearing and the certainty of pretrial identifications belie any claim that the in-court identifications were impermissibly tainted *(see, e.g., People v Sims,* 150 AD2d 402, 404). We have examined defendant's remaining contentions and find them to be without merit. Concur—Kupferman, J. P., Carro, Rosenberger, Ellerin and Rubin, JJ.