People v Pendell (2018 NY Slip Op 05899)





People v Pendell


2018 NY Slip Op 05899


Decided on August 23, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: August 23, 2018

107184

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
PERRY PENDELL, Appellant.

Calendar Date: June 8, 2018

Before: McCarthy, J.P., Egan Jr., Lynch, Clark and Pritzker, JJ.


Matthew C. Hug, Albany, for appellant, and appellant
pro se.
Paul Czajka, District Attorney, Hudson (James Carlucci of counsel), for respondent.



MEMORANDUM AND ORDER
Lynch, J.
Appeal from a judgment of the County Court of Columbia County (Koweek, J.), rendered August 19, 2014, upon a verdict convicting defendant of the crimes of rape in the second degree (nine counts), criminal sexual act in the second degree, possessing a sexual performance by a child (four counts) and criminal solicitation in the second degree.
In May 2013, defendant — then 48 years old — was charged in a 27-count indictment (hereinafter the first indictment) with various offenses stemming from his alleged sexual contact, over a period of several months, with a 14-year-old girl (hereinafter the victim) that he met through an online adult dating service. While awaiting prosecution on these charges in jail, defendant
approached another inmate about having the victim murdered and, as a result, was charged, in a second indictment (hereinafter the second indictment), with criminal solicitation in the second degree. County Court thereafter consolidated the two indictments. Following a jury trial, defendant was convicted of nine counts of rape in the second degree, one count of criminal sexual act in the second degree, four counts of possessing a sexual performance by a child and one count of criminal solicitation in the second degree. Defendant was sentenced to prison terms of seven years on each of his convictions for rape in the second degree, each to be followed by 10 years of postrelease supervision, 1&frac13; to 4 years on each of his convictions for possessing a sexual performance by a child and 2&frac13; to 7 years on his conviction for criminal solicitation in the second degree, all to be served consecutively. Defendant was also sentenced to a prison term of seven years for his conviction for criminal sexual act in the second degree, which County Court directed was to be served concurrently with his sentence on the first count of rape in the second [*2]degree. Defendant now appeals.
Defendant challenges his convictions as unsupported by legally sufficient evidence and against the weight of the evidence. Initially, defendant preserved his legal sufficiency argument only with respect to the four counts of possessing a sexual performance by a child by moving, pretrial, to dismiss those counts on the same grounds that he now raises on appeal (see People v Finch, 23 NY3d 408, 412-414 [2014]; People v Mahboubian, 74 NY2d 174, 188 [1989])[FN1]. Inasmuch as defendant's motion for a trial order of dismissal, made at the close of the People's proof and renewed at the close of all of the proof, was not "'specifically directed' at the error[s] being urged" on appeal, his legal sufficiency challenge to the remainder of his convictions is unpreserved (People v Hawkins, 11 NY3d 484, 492 [2008], quoting People v Gray, 86 NY2d 10, 19 [1995]; see People v Stokes, 159 AD3d 1041, 1042 [2018]). Nevertheless, as part of our weight of the evidence review, we will necessarily assess whether each element of the charged crimes was proven beyond a reasonable doubt (see People v Danielson, 9 NY3d 342, 349 [2007]; People v Chaneyfield, 157 AD3d 996, 996 [2018], lv denied 31 NY3d 1012 [2018]; People v Holmes, 151 AD3d 1181, 1182 [2017], lv denied 29 NY3d 1128 [2017]).
Defendant argues that because the photographs underlying the four counts of possessing a sexual performance by a child do not depict genitalia, as required, they are not supported by legally sufficient evidence. "A person is guilty of possessing a sexual performance by a child when, knowing the character and content thereof, he [or she] knowingly has in his [or her] possession or control, or knowingly accesses with intent to view, any performance which includes sexual conduct by a child less than [16] years of age" (Penal Law § 263.16). Under this particular section of the Penal Law, "[s]exual conduct" means, among other things, the "lewd exhibition of the genitals" (Penal Law § 263.00 [3]). The lewd exhibition of any body part other than the genitals does not fall within the meaning of sexual conduct, as defined in Penal Law § 263.00 (3) (see People v Pinkoski, 300 AD2d 834, 836-837 [2002], lv denied 99 NY2d 631 [2003]).
The photographs that form the basis for defendant's convictions on counts 21, 22 and 27 of the first indictment depict only the victim's bare chest, which does not constitute "lewd exhibition of the genitals," as required for a conviction for possessing a sexual performance by a child (see Penal Law §§ 263.00 [3]; 263.16; People v Pinkoski, 300 AD2d at 836-837). Accordingly, defendant's convictions on counts 21, 22 and 27 of the first indictment must be reversed and those counts of the first indictment dismissed (see People v Pinkoski, 300 AD2d at 836-837). As to defendant's remaining conviction for possessing a sexual performance by a child (count 20 of the first indictment), we find that the underlying photograph, which depicts the victim posing completely nude, save for a portion of one pant leg, constitutes the lewd exhibition of genitalia within the meaning of Penal Law § 263.16 (see generally People v Horner, 300 AD2d 841, 842-843 [2002]; compare People v Gibeault, 5 AD3d 952, 954 [2004]). As the evidence further established that the victim was under the age of 16 at the time that the underlying photograph was taken and that defendant knowingly possessed the photograph, which was ultimately found on his cell phone, defendant's conviction on count 20 of the first indictment is supported by legally sufficient evidence (see Penal Law § 263.16; People v Horner, 300 AD2d at 843-844) and was not against the weight of the evidence (see People v Sparagano, 153 AD3d 1367, 1367-1368 [2017], lv denied 30 NY3d 1063 [2017]).
As to defendant's contention that his remaining convictions are against the weight of the evidence, we have reviewed the proof supporting each conviction and are satisfied that the weight of the credible evidence supports defendant's convictions on nine counts of rape in the second degree (counts 1, 3, 5, 7, 9, 11, 13, 15 and 17 of the first indictment) (see Penal Law § 130.30 [1]; People v Richards, 78 AD3d 1221, 1222-1224 [2010], lv denied 15 NY3d 955 [2010]; People v Hebert, 68 AD3d 1530, 1531-1532 [2009], lv denied 14 NY3d 841 [2010]; People v Workman, 56 AD3d 1155, 1156-1157 [2008], lv denied 12 NY3d 789 [2009]; People v Gray, 15 AD3d 889, 890 [2005], lv denied 4 NY3d 831 [2005]), one count of criminal sexual act in the second degree (count 2 of the first indictment) (see Penal Law § 130.45 [1]; People v Richards, 78 AD3d at 1222-1224) and one count of criminal solicitation in the second degree (count 1 of the second indictment) (see Penal Law § 100.10; People v Adamek, 69 AD3d 979, 980 [2010], lv denied 14 NY3d 797 [2010]; People v Bongarzone, 116 AD2d 164, 168 [1986], affd 69 NY2d 892 [1987]).
The victim testified at trial that, in or around October 2012, when she was 14 years old, she met a man named Jason — whom she later identified as defendant — through an online adult dating service wherein she represented that she was 19 years old and seeking to meet adult males for sexual contact. According to the victim, on approximately 10 to 13 occasions thereafter, defendant picked her up at her home and brought her to a nearby motel, where the two would engage in "[n]ormal" sex and oral sex [FN2]. She testified that, after their first encounter, she continued to have sexual contact with defendant only because he would provide her with marihuana. As established by text messages between defendant and the victim, the victim expressed to defendant in mid January 2013 that she no longer wanted to have sex with him, to which defendant replied that if she did not "pay as normal," she would have to purchase the marihuana. The text messages further reveal that defendant continued to contact the victim throughout the following month regarding a debt that she owed him. In particular, defendant stated that if she could not come up with the required money by the end of the month, he would have to take "extreame [sic] measures" and send someone to collect the debt. The victim testified that she attempted suicide in March 2013 and, while hospitalized thereafter, disclosed her involvement with defendant to her therapist and parents.
In April 2013, law enforcement conducted a sting operation in which an investigator sent defendant text messages from the victim's cell phone requesting that the two meet to exchange sex for marihuana and to satisfy the victim's outstanding debt. When defendant arrived at the prearranged location, expecting to meet the victim, he was apprehended by the police. A subsequent search of his person resulted in the recovery of a prescription bottle of erectile dysfunction medication that had been filled just hours earlier. Notably, a pill was missing from that prescription. Also found on defendant's person was a prepaid cell phone, which defendant admitted using only to communicate with the victim and for which he registered a false address.
After the sting operation, police confiscated two computers found at defendant's residence, one of which contained a pornographic audio and video recording depicting a male and female engaged in sexual intercourse. The audio and video recording was admitted into evidence and played for the jury more than once, and the voices of both the male and the female could be heard. Significantly, the victim identified herself as the female in still shots taken from [*3]the recording. Further, the bracelet worn by the female in the recording was identified by multiple witnesses as belonging to the victim. Room rental slips from the motel, which were admitted into evidence, indicated that defendant rented a room at the same motel on the nine dates specified in the indictment, as well as the day of the sting operation resulting in his apprehension [FN3]. Moreover, certified records from an EZ-Pass registered in defendant's name demonstrated that, on all but one of the dates specified in the indictment, one of the registered vehicles — either a Ford F350 or a Mercedes — used the EZ-Pass at a toll plaza not far from Columbia County.[FN4]
Defendant testified on his own behalf and asserted that all but his initial interaction with the victim was induced by threats made by the victim. Defendant admitted that he sought out the victim online for sex. However, he testified that, when he picked her up for their first encounter, he immediately realized that she was under 18 years of age and informed her that he could not have sex with her. According to defendant, the victim became enraged and threatened to tell her therapist about him if he did not provide her with sex and marihuana. Defendant testified that, worried that the victim would accuse him of rape and perceiving no choice but to appease her, he agreed to bring the victim to a motel so that she could smoke the marihuana he had. Defendant admitted on cross-examination to supplying a false home address on the room rental slips beginning on the third rental. While defendant acknowledged staying at the motel on the dates in question, he insisted that the victim was only present on six or seven occasions. Defendant, however, denied having sexual contact with the victim on any occasion and insisted that, fearful that the victim would follow through on her threats, he continued to drive from New Jersey to meet with the victim for the sole purpose of providing her with marihuana. Defendant also maintained that he was not the male in the audio and video recording recovered from his computer.
As to defendant's conviction for criminal solicitation in the second degree, an inmate incarcerated with defendant testified that defendant initially asked him, through passed notes written on small slips of paper, if he had any friends who would say that they were at a certain motel at a certain time with the victim but, thereafter, inquired if he knew anyone who could be hired to murder the victim. In these notes, which were ultimately turned over to law enforcement, defendant wrote that a "disappearing act would be best, like [the victim] ran away or something," and that the person hired would "have to try to catch [the victim] alone or hit her bro up with a needle then take her for a ride . . . and put her in a very deep hole." The notes indicated that defendant initially offered "100G" for the job, with a "[b]onus if done by Aug 29 2013." An investigator testified at trial that the cooperating inmate was instructed to contact defendant to raise the price for murdering the victim to $125,000, and that defendant agreed, adding that, "[Making] the [p]roblem 'disappear' is important! [But] so is your [boy's] [*4]testimony."[FN5] The inmate also testified that he obtained, from defendant's cell, a hand-drawn map of the area in and around the victim's residence, which was ultimately received by law enforcement and introduced into evidence at trial.
Defendant presented a duress defense to the solicitation charge. He testified that, upon arriving in jail, he was immediately threatened by other inmates who had heard about his charges. According to defendant, he confided in the cooperating inmate and shared that he was trying to find the individual who he believed actually had sex with the victim. Defendant admitted that he had offered the inmate money to find a minor who would be willing to testify that he had sex with the victim on the dates in question. Defendant went on to testify, however, that, when he decided not to go through with that plan, the cooperating inmate threatened his wife and forced him to write the notes. According to defendant, he drew the map taken from his cell for his attorney and investigator, in preparation for trial. Upon consideration of all the foregoing evidence, which raised issues of credibility for the jury to assess, we conclude that the jury's verdict was amply supported by the weight of the evidence.
Of the many evidentiary objections that defendant lodged throughout the trial, he specifically challenges on appeal the admission of over 25 photographic exhibits into evidence, most of which were recovered from either defendant's prepaid cell phone or one of his home computers. Defendant argues that County Court erroneously admitted the exhibits into evidence. We disagree.
At issue is whether a proper foundation was proffered validating the authenticity of the photographs, eight of which depicted the victim in various stages of undress [FN6]. The purpose of requiring a showing of authenticity is to confirm that the evidence is genuine. A photograph must be shown to "accurately represent[] the subject matter depicted" (People v Byrnes, 33 NY2d 343, 347 [1974]). Authentication generally requires a witness to testify that a photograph is accurate and has not been altered (see People v Price, 29 NY3d 472, 477 [2017]). Even so, "'[t]he foundation necessary to establish [authenticity] may differ according to the nature of the evidence sought to be admitted'" (id. at 476, quoting People v McGee, 49 NY2d 48, 59 [1979]).
Although the foundational questioning here was brief, the controlling point is that the victim identified herself in all of the photographs. She confirmed that she took several of the [*5]photographs of herself in her room at home and sent those photographs to defendant. She also explained that defendant took some of the photographs of her at the motel, where he admitted he took her on multiple occasions. All of the photographs of the victim were obtained from either defendant's cell phone or his home computer. We thus have the victim authenticating, as both photographer and subject, the pictures that she took of herself and that she provided to defendant. As for photographs taken by defendant at the hotel, the victim, as subject, confirmed that she was depicted in the photographs, without qualification. We also know from her testimony that these photographs were taken between October 2012 and March 2013. There was also explicit testimony from Constance Leege, a special agent with the United States Secret Service, explaining the process that she utilized to extract seven of the photographs from defendant's cell phone, and testimony from her colleague, Robert Lupe, who performed a forensic analysis of defendant's computer to extract the remaining photographic image.
Given the foregoing, we find that the victim's testimony adequately authenticated the photographs taken of her person and thus were properly received into evidence (see People v Price, 29 NY3d at 476-477). This testimony tells us not only who was depicted in the photographs, but also who took the photographs, the time period during which the photographs were taken, where the photographs were taken and the underlying circumstances (compare People v Price, 29 NY3d at 475). Any error with respect to the remaining background photographs was harmless. In light of the overwhelming evidence of defendant's guilt, as detailed above, there is not a significant probability that defendant would have been acquitted had these photographs — the majority of which were cumulative and depicted items such as the victim's bedroom, defendant's car and defendant's computer — not been admitted into evidence (see People v Cummings, 157 AD3d 982, 986 [2018], lv denied 31 NY3d 982 [2018]; People v Crimmins, 36 NY2d 230, 241-242 [1975]).
Contrary to defendant's contention, County Court did not abuse its discretion in consolidating the two indictments (see CPL 200.20 [2] [b]; [4]), as evidence of the offense charged in the second indictment — criminal solicitation in the second degree — is material and admissible in a trial of the offenses charged in the first indictment (see People v Morman, 145 AD3d 1435, 1437 [2016], lv denied 29 NY3d 999 [2017]; People v Watson, 281 AD2d 691, 693 [2001], lv denied 96 NY2d 925 [2001]), and evidence of the crimes charged in the first indictment would be material and admissible in a trial on the criminal solicitation charge to demonstrate motive (see People v Bongarzone, 69 NY2d 892, 895 [1987]).
Next, we are not persuaded by defendant's contention that County Court violated his right to confrontation by restricting his questioning of the victim as to her use of the adult website through which she made contact with defendant. Initially, we do agree with defendant that the victim's use of the website does not, of itself, trigger the protections of the Rape Shield Law, which prohibits evidence of a victim's sexual conduct in a case prosecuted under Penal Law article 130, with certain exceptions (see CPL 60.42; People v Scott, 16 NY3d 589, 593-594 [2011]; People v Contreras, 47 AD3d 411, 412 [2008], affd 12 NY3d 268 [2009]; People v Jovanovic, 263 AD2d 182, 193-198 [1999], lv granted 94 NY2d 908 [2000], appeal dismissed 95 NY2d 846 [2000]). That said, defendant was allowed to cross-examine the victim as to the fact that she met defendant through the website, knew that the purpose of the site was "for finding people to have sex with" and lied about her age by affirming that she was over 18 to gain access to the site. Because the victim was a minor, she was incapable of consenting to any sexual interaction with defendant and, thus, any information as to her use of this website was otherwise irrelevant (see Penal Law § 130.05 [2] [b]; [3] [a]; People v Simmons, 103 AD3d 1027, 1029 [2013], lv denied 21 NY3d 1009 [2013]). Additionally, any evidence about how the victim's photographs came to be on defendant's phone and computer is irrelevant as to Penal Law § [*6]263.16, which only requires knowing possession.
With respect to the video recording, defendant maintains that County Court erred in precluding his testimony that the video was taken while the victim and another man were in the motel room without him, and then instructing the jury to disregard any "comments made about another person in the room
. . . and potentially issues of sexual activity" as precluded by the Rape Shield Law. We agree with County Court that this testimony, in context, speaks to sexual conduct that generally would be precluded. Nor did defendant request an exception under CPL 60.42 (5), which would require an offer of proof demonstrating that the evidence should be "admissible in the interests of justice." Notably, in defendant's ensuing testimony, he testified that he was not the man shown in the video. Defendant further testified that he had no tattoos and was allowed to demonstrate his scars to the jury so as to differentiate himself from the man in the video. As such, any error here was rendered harmless.
Nor are we persuaded that defendant's sentence, which is extensive, is unduly harsh and excessive when we consider his prior felony conviction for endangering the welfare of a child, the repeated encounters with the victim and his extraordinary attempt to have her killed prior to the trial. Defendant's contention that the nine counts of rape were rendered duplicitous by the evidence at trial was not preserved because no such objection was made at trial. Defendant did not request the victim's confidential mental health records, nor is there any indication in the record that the People were in possession of such records. We are unpersuaded by defendant's contention in his pro se brief that the record on appeal is inaccurate and/or incomplete. To the extent that defendant also asserts that he received the ineffective assistance of appellate counsel, that issue is not properly before us on direct appeal. We have reviewed defendant's remaining contentions and find them unavailing.
McCarthy, J.P., Egan Jr. and Pritzker, JJ., concur.




Clark, J. (concurring in part and dissenting in part).


I depart from the majority on the issue of whether the challenged photographic exhibits were authenticated and, thus, properly admitted into evidence. In my view, the People failed to elicit sufficient testimony to satisfy the basic and well-established foundational requirements necessary to properly admit the challenged photographs into evidence. Because I cannot overlook, as the majority has, the People's repeated failure to establish that the photographs were true, accurate and unaltered reproductions of the photographs actually recovered from defendant's cell phone and computer, I respectfully dissent from that aspect of the majority's decision.
Courts have long recognized the important and integral role that the rules of evidence play "in the administration of justice" (Patten v United Life & Acc. Ins. Assn., 133 NY 450, 455 [1892]; see e.g. People v Conyers, 52 NY2d 454, 460 [1981]; Terpenning v Corn Exch. Ins. Co., 43 NY 279, 283 [1871]). Among their many functions, the rules of evidence protect the criminally accused from prejudice (see People v Wolf, 183 NY 464, 479 [1906]; People v Mull, 167 NY 247, 253-254 [1901]) and safeguard the overall "integrity of the truth-finding process" (People v Conyers, 52 NY2d at 460; see e.g. Hope v Hearst Consol. Publ., Inc., 294 F2d 681, 690 [2d Cir 1961], cert denied 368 US 956 [1962]; see generally United States v Nixon, 418 US 683, 709 [1974]; Funk v United States, 290 US 371, 381 [1933]). As made clear from its name, the evidentiary authentication requirement seeks to assure the authenticity and, thus, the integrity of evidence presented to juries (see generally People v Price, 29 NY3d 472, 476-477 [2017]; United [*7]States v Ianniello, 621 F Supp 1455, 1468 [SD NY 1985]). In particular, the authentication requirement demands that the party seeking to admit photographic evidence establish that each offered photograph "accurately represent[s] the subject matter depicted" (People v Byrnes, 33 NY2d 343, 347 [1974]; accord People v Price, 29 NY3d at 477; People v Marra, 96 AD3d 1623, 1625-1626 [2012], affd 21 NY3d 979 [2013]; see generally People v McGee, 49 NY2d 48, 59 [1979]). Indeed, "'the ultimate object of the authentication requirement is to insure the accuracy of the photograph sought to be admitted into evidence[. Thus,] any person having the requisite knowledge of the facts may verify,' or an expert may testify[,] that the photograph has not been altered" (People v Price, 29 NY3d at 477, quoting People v Byrnes, 33 NY2d at 347).
The People's foundational questioning here, generously described by the majority as "brief," was wholly lacking in substance. Although the People asked appropriate witnesses, including the victim, to identify the subject matter of the photographs to which they had knowledge, little or no additional information was elicited. Fatally, the People did not elicit any testimony that could establish that any of the photographs fairly and accurately depict the subject matter identified therein (see People v Price, 29 NY3d at 480; People v Wells, 161 AD3d 1200, 1200 [2018]; compare People v Dawkins, 240 AD2d 962, 964 [1997], lvs denied 90 NY2d 903 [1997]).
Specifically, with respect to the 16 photographic exhibits depicting the victim in various stages of undress, the People simply asked the victim whether each photograph "look[ed] familiar." Contrary to the assertions of the majority, the victim's general testimony identifying herself as the person depicted in those photographs was insufficient to properly authenticate them. Even if the victim's testimony demonstrated that the photographs admitted into evidence were a fair representation of the photographs that she took or were taken of her, as the majority contends, no one testified that the admitted photographs had not been altered or that they were true and accurate representations of the photographs actually recovered from defendant's cell phone and computer [FN1] (see People v Price, 29 NY3d at 478). There was simply no sworn testimony to refute the possibility that the photographs had been manipulated.
Although not discussed by the majority in detail, the remaining 10 photographic exhibits allegedly depict a motel room, different areas in the victim's bedroom and defendant's home computers, vehicle and residence. These photographs were offered into evidence to corroborate the victim's testimony, to provide background information and/or to allow the jury to assess whether the photographs of the victim were taken in either the motel room or the victim's bedroom. As with the photographs of the victim, the People did not elicit any testimony whatsoever to establish that these photographs fairly and accurately represented the subject matter depicted therein, as required (see People v Price, 29 NY3d at 477; People v Byrnes, 33 NY2d at 347).
Despite the obvious absence of any testimony to satisfy the basic foundational requirements when evidence is proffered, County Court consistently overruled defendant's repeated and appropriate protestations and improperly admitted the challenged photographic exhibits into evidence. By not demanding strict adherence to basic foundational requirements, [*8]County Court abdicated its role as gatekeeper to ensure the integrity of the evidence presented to the jury (see generally People v Boone, 30 NY3d 521, 538 [2017] [Garcia, J., concurring]; People v Vining, 28 NY3d 686, 693 [2017]; People v Johnson, 27 NY3d 199, 208 [2016]). At no point did the People elicit any testimony that would satisfy the accuracy requirement for any of the 25 photographic exhibits. Such testimony is crucial, particularly given that photographs are, in this day and age, increasingly more vulnerable to manipulation, however slight (see generally 2 McCormick on Evidence § 215 [7th ed 2016]; Jill Witkowski, Note, Can Juries Really Believe What They See? New Foundational Requirements for the Authentication of Digital Images, 10 Wash U JL & Pol'y 267 [2002]; Victor E. Bianchini & Harvey Bass, A Paradigm for the Authentication of Photographic Evidence in the Digital Age, 10 T Jefferson L Rev 303 [1998]). In this case, even small — seemingly innocuous — alterations, such as enlargements or zooming, could have impacted whether a photograph formed the basis for the charge of possessing a sexual performance by a child (see generally People v Horner, 300 AD2d 841, 842-843 [2002]). In my view, the admission of the 25 photographic exhibits into evidence without a proper foundation was clear error.
Without consideration of the erroneously admitted exhibits, I do not find the evidence of defendant's guilt to be overwhelming (see generally People v Byer, 21 NY3d 887, 889 [2013]; People v Crimmins, 36 NY2d 230, 241-242 [1975]). The 25 photographic exhibits were essential to the People's case, for many served as direct evidence of the charges of possessing a sexual performance by a child, as well as circumstantial evidence establishing the sexual nature of defendant's relationship with the victim. Without the erroneously admitted photographs, the charges of possessing a sexual performance by a child would have fallen, and the overall strength of the People's case on the remaining charges would have been significantly weakened. The People's foundational and substantive questioning of all of the witnesses was shockingly minimal, which resulted in a situation in which the challenged photographs played a substantial role in establishing the People's case. Moreover, I do not find that "there was no significant probability that the jury would have acquitted [defendant] had the proscribed evidence not been introduced" (People v Cummings, 31 NY3d 204, 212 [2018]; see People v Byer, 21 NY3d at 889; People v Crimmins, 36 NY2d at 241-242). It is hard to imagine how the photographic exhibits did not impact the jury's verdict, when many of the exhibits formed the basis for several of the counts in the indictment, and the sexual nature of many of the challenged exhibits certainly could have influenced the jury's consideration of all of the charges. Accordingly, I find that County Court's error in admitting over 25 photographic exhibits without proper foundation was not harmless, particularly given the nature and content of many of those photographs. Thus, I would reverse defendant's convictions for rape in the second degree (counts 1, 3, 5, 7, 9, 11, 13, 15 and 17 of indictment No. 13-017), criminal sexual act in the second degree (count 2 of indictment No. 13-017), possessing a sexual performance by a child (count 20 of indictment No. 13-017) and criminal solicitation in the second degree (count 1 of indictment No. 13-022), and remit the matter for a new trial on those counts (see CPL 470.20 [1]; People v Peters, 157 AD3d 79, 85 [2017], lv denied 30 NY3d 1118 [2018]; People v Cordova, 127 AD3d 1227, 1228 [2015]; People v Perkins, 189 AD2d 830, 833 [1993]; People v Moss, 168 AD2d 960, 960 [1990]; compare People v Rossi, 80 NY2d 952, 954 [1992], lv denied 81 NY2d 835 [1993]; People v Kevin W., 91 AD3d 676, 677-678 [2012], affd 22 NY3d 287 [2013]).
ORDERED that the judgment is modified, on the law, by reversing defendant's convictions of possessing a sexual performance by a child under counts 21, 22 and 27 of indictment No. 13-017; said counts dismissed and the sentences imposed thereon vacated; and, as so modified, affirmed.



Footnotes

Footnote 1: Two of the original eight counts of possessing a sexual performance by a child were dismissed upon defendant's pretrial motion, and the jury acquitted defendant of two other counts.

Footnote 2: We reject defendant's assertion that the victim's testimony approximating the number of her encounters with defendant constituted evidence of prior uncharged crimes (see generally People v Ventimiglia, 52 NY2d 350, 359 [1981]).

Footnote 3: With respect to the room rental slips, defendant failed to preserve the specific evidentiary argument he now raises on appeal (see People v Edwards, 39 AD3d 1078, 1080-1081 [2007]; People v Dunn, 204 AD2d 919, 920-921 [1994], lvs denied 84 NY2d 907 [1994]).

Footnote 4: The EZ-Pass records also corroborated the victim's testimony that defendant would pick her up in either a black Mercedes or a white truck.

Footnote 5: We are unpersuaded by defendant's contention that the handwritten notes were not properly authenticated. The circumstantial evidence, including the inmate's testimony and the content of the notes themselves, satisfied the authentication requirement (see People v Jackson, 125 AD3d 1002, 1003 [2015], lv denied 25 NY3d 1202 [2015]; People v Myers, 87 AD3d 826, 827-828 [2011], lv denied 17 NY3d 954 [2011]; People v Bryant, 12 AD3d 1077, 1079 [2004], lv denied 4 NY3d 761 [2005]; People v Thomas, 272 AD2d 892, 893 [2000], lv denied 95 NY2d 858 [2000]).

Footnote 6: Each of these eight photographs was admitted into evidence in both paper form and as a digital image on a CD, comprising 16 exhibits in total. While the photographs involved 25 exhibits, in actuality, there were only 17 separate and distinct photographs admitted into evidence.

Footnote 1: With respect to People's exhibit Nos. 5 and 5a, there was absolutely no testimony whatsoever establishing where the photograph was originally found or the location from which it was extracted, and there is nothing linking the photograph to defendant.